CALVERT CLIFFS' COORDINATING
COMMITTEE, INC., et al.,
Petitioners,

v.

UNITED STATES ATOMIC ENERGY
COMMISSION and United States
of America, Respondents,

Baltimore Gas and Electric Company,
Intervenor.

CALVERT CLIFFS' COORDINATING
COMMITTEE, INC., et al.,
Petitioners,

v.

UNITED STATES ATOMIC ENERGY
COMMISSION and United States
of America, Respondents.

Nos. 24839, 24871.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 16, 1971.

Decided July 23, 1971.

Mr. Anthony Z. Roisman, Washington, D. C., with whom Messrs. Myron M. Cherry, Chicago, Ill., and Lewis Drain, Grand Rapids, Mich., were on the brief, for petitioners.

Mr. Marcus A. Rowden, Solicitor, Atomic Energy Commission, with whom Messrs. Howard K. Shapar, Asst. Gen. Counsel, Licensing and Regulation, Atomic Energy Commission, and Edmund Clark, Atty., Department of Justice, were on the brief, for respondents. Mr. William C. Parler, Atty., Atomic Energy Commission, also entered an appearance for respondent Atomic Energy Commission.

Mr. George F. Trowbridge, Washington, D. C., with whom Mr. Jay E. Silberg, Washington, D. C., was on the brief, for intervenor in No. 24,839.

Messrs. George D. Gibson and Arnold H. Quint, Washington, D. C., filed a brief on behalf of Duke Power Company et al. as amici curiae in No. 24,871.

Mr. Roy B. Snapp, Washington, D. C., filed a brief on behalf of Arkansas Power and Light Company as amicus curiae in No. 24,871.

Messrs. Arvin E. Upton, Leonard M. Trosten and Henry V. Nickel, Washington, D. C., filed a brief on behalf of Consolidated Edison Company as amicus curiae in No. 24,871.

Mr. Jerome E. Sharfman, Washington, D. C., filed a brief on behalf of Consumers Power Company as amicus curiae in No. 24,871.

Messrs. H. Edward Dunkelberger, Jr., Christopher M. Little and Peter M. Phillipes, Washington, D. C., filed a brief on behalf of Indiana and Michigan Electric Company and Portland General Electric Company as amici curiae in No. 24,871.

Before WRIGHT, TAMM and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

These cases are only the beginning of what promises to become a flood of new litigation—litigation seeking judicial assistance in protecting our natural environment. Several recently enacted statutes attest to the commitment of the Government. to control, at long last, the destructive engine of material "progress." [1] But it remains to be seen whether the promise of this legislation will become a reality. Therein lies the judicial role. In these cases, we must for the first time interpret the broadest and perhaps most important of the recent statutes: the National Environmental Policy Act of 1969 (NEPA). [2] We must assess claims that one of the agencies charged with its administration has failed to live up to the congressional mandate. Our duty, in short, is to see that important legislative purposes, heralded in the halls of Congress, are not lost or misdirected in the vast hallways of the federal bureaucracy.

NEPA, like so much other reform legislation of the last 40 years, is cast in terms of a general mandate and broad delegation of authority to new and old administrative agencies. It takes the major step of requiring all federal agencies to consider values of environmental preservation in their spheres of activity, and it prescribes certain procedural measures to ensure that those values are in fact fully respected. Petitioners argue that rules recently adopted by the Atomic Energy Commission to govern consideration of environmental matters

---

1. *See, e. g.*, Environmental Education Act, 20 U.S.C.A. § 1531 (1971 Pocket Part); Air Quality Act of 1967, 42 U.S.C. § 1857 *et seq.* (Supp. V 1965–1969); Environmental Quality Improvement Act of 1970, 42 U.S.C.A. §§ 4371–4374 (1971 Pocket Part); Water and Environmental Quality Improvement Act of 1970, Pub. L. 91–224, 91st Cong., 2d Sess. (1970), 84 Stat. 91.

2. 42 U.S.C.A. § 4321 *et seq.* (1971 Pocket Part).

fail to satisfy the rigor demanded by NEPA. The Commission, on the other hand, contends that the vagueness of the NEPA mandate and delegation leaves much room for discretion and that the rules challenged by petitioners fall well within the broad scope of the Act. We find the policies embodied in NEPA to be a good deal clearer and more demanding than does the Commission. We conclude that the Commission's procedural rules do not comply with the congressional policy. Hence we remand these cases for further rule making.

## I

We begin our analysis with an examination of NEPA's structure and approach and of the Atomic Energy Commission rules which are said to conflict with the requirements of the Act. The relevant portion of NEPA is Title I, consisting of five sections.[3] Section 101 sets forth the Act's basic substantive policy: that the federal government "use all practicable means and measures" to protect environmental values. Congress did not establish environmental protection as an exclusive goal; rather, it desired a reordering of priorities, so that environmental costs and benefits will assume their proper place along with other considerations. In Section 101(b), imposing an explicit duty on federal officials, the Act provides that "it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy," to avoid environmental degradation, preserve "historic, cultural, and natural" resources, and promote "the widest range of beneficial uses of the environment without * * *

undesirable and unintended consequences."

Thus the general substantive policy of the Act is a flexible one. It leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances. However, the Act also contains very important "procedural" provisions—provisions which are designed to see that all federal agencies do in fact exercise the substantive discretion given them. These provisions are not highly flexible. Indeed, they establish a strict standard of compliance.

NEPA, first of all, makes environmental protection a part of the mandate of every federal agency and department. The Atomic Energy Commission, for example, had continually asserted, prior to NEPA, that it had no statutory authority to concern itself with the adverse environmental effects of its actions.[4] Now, however, its hands are no longer tied. It is not only permitted, but compelled, to take environmental values into account. Perhaps the greatest importance of NEPA is to require the Atomic Energy Commission and other agencies to *consider* environmental issues just as they consider other matters within their mandates. This compulsion is most plainly stated in Section 102. There, "Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act * * *." Congress also "authorizes and directs" that "(2) all agencies of the Federal Government shall" follow certain rigorous procedures in considering environmental values.[5] Senator Jackson,

---

3. The full text of Title I is printed as an appendix to this opinion.

4. Before the enactment of NEPA, the Commission did recognize its separate statutory mandate to consider the specific radiological hazards caused by its actions; but it argued that it could not consider broader environmental impacts. Its position was upheld in State of New Hamp-

shire v. Atomic Energy Commission, 1 Cir., 406 F.2d 170, *cert. denied*, 395 U.S. 962, 89 S.Ct. 2100, 23 L.Ed.2d 748 (1969).

5. Only once—in § 102(2) (B)—does the Act state, in terms, that federal agencies must give full "consideration" to environmental impact as part of their decision making processes. However, a require-

NEPA's principal sponsor, stated that "[n]o agency will [now] be able to maintain that it has no mandate or no requirement to consider the environmental consequences of its actions." [6] He characterized the requirements of Section 102 as "action-forcing" and stated that "[o]therwise, these lofty declarations [in Section 101] are nothing more than that." [7]

The sort of consideration of environmental values which NEPA compels is clarified in Section 102(2) (A) and (B). In general, all agencies must use a "systematic, interdisciplinary approach" to environmental planning and evaluation "in decisionmaking which may have an impact on man's environment." In order to include all possible environmental factors in the decisional equation, agencies must "identify and develop methods and procedures * * * which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." [8] "Environmental amenities" will often be in conflict with "economic and technical considerations." To "consider" the former "along with" the latter must involve a balancing process. In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not. But NEPA mandates a rather finely tuned and "systematic" balancing analysis in each instance.[9]

---

ment of consideration is clearly implicit in the substantive mandate of § 101, in the requirement of § 102(1) that all laws and regulations be "interpreted and administered" in accord with that mandate, and in the other specific procedural measures compelled by § 102(2). The only circuit to interpret NEPA to date has said that "[t]his Act essentially states that every federal agency shall consider ecological factors when dealing with activities which may have an impact on man's environment." Zabel v. Tabb, 5 Cir., 430 F.2d 199, 211 (1970). Thus a purely mechanical compliance with the particular measures required in § 102(2) (C) & (D) will not satisfy the Act if they do not amount to full good faith *consideration* of the environment. *See* text at page 1116 *infra.* The requirements of § 102(2) must not be read so narrowly as to erase the general import of §§ 101, 102(1) and 102(2) (A) & (B).

On April 23, 1971, the Council on Environmental Quality—established by NEPA—issued guidelines for federal agencies on compliance with the Act. 36 Fed. Reg. 7723 (April 23, 1971). The Council stated that "[t]he objective of section 102(2) (C) of the Act and of these guidelines is to build into the agency decision making process an appropriate and careful consideration of the environmental aspects of proposed action * * *." *Id.* at 7724.

6. Hearings on S. 1075, S. 237 and S. 1752 Before Senate Committee on Interior and Insular Affairs, 91st Cong., 1st Sess. 206 (1969). Just before the Senate finally approved NEPA, Senator Jackson said on the floor that the Act "directs all agencies to assure consideration of the environmental impact of their actions in decisionmaking." 115 Cong.Rec. (Part 30) 40416 (1969).

7. Hearings on S. 1075, *supra* Note 6, at 116. Again, the Senator reemphasized his point on the floor of the Senate, saying: "To insure that the policies and goals defined in this act are infused into the ongoing programs and actions of the Federal Government, the act also established some important 'action-forcing' procedures." 115 Cong.Rec. (Part 30) at 40416. The Senate Committee on Interior and Insular Affairs Committee Report on NEPA also stressed the importance of the "action-forcing" provisions which require full and rigorous consideration of environmental values as an integral part of agency decision making. S.Rep.No.91–296, 91st Cong., 1st Sess. (1969).

8. The word "appropriate" in § 102(2) (B) cannot be interpreted to blunt the thrust of the whole Act or to give agencies broad discretion to downplay environmental factors in their decision making processes. The Act requires consideration "appropriate" to the problem of protecting our threatened environment, not consideration "appropriate" to the whims, habits or other particular concerns of federal agencies. *See* Note 5 *supra.*

9. Senator Jackson specifically recognized the requirement of a balancing judgment. He said on the floor of the Senate: "Subsection 102(b) requires the development of procedures designed to insure that all relevant environmental values and

To ensure that the balancing analysis is carried out and given full effect, Section 102(2) (C) requires that responsible officials of all agencies prepare a "detailed statement" covering the impact of particular actions on the environment, the environmental costs which might be avoided, and alternative measures which might alter the cost-benefit equation. The apparent purpose of the "detailed statement" is to aid in the agencies' own decision making process and to advise other interested agencies and the public of the environmental consequences of planned federal action. Beyond the "detailed statement," Section 102(2) (D) requires all agencies specifically to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." This requirement, like the "detailed statement" requirement, seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal "detailed statement" and a description of alternatives, NEPA provides evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own.

Of course, all of these Section 102 duties are qualified by the phrase "to the fullest extent possible." We must stress as forcefully as possible that this language does not provide an escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow "discretionary." Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration "to the fullest extent possible" sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts.

Unlike the substantive duties of Section 101(b), which require agencies to "use all practicable means consistent with other essential considerations," the procedural duties of Section 102 must be fulfilled to the "fullest extent possible." [10] This contrast, in itself, is revealing. But the dispositive factor in our interpretation is the expressed views of the Senate and House conferees who wrote the "fullest extent possible" language into NEPA. They stated: [11]

"* * * The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in * * * [Section 102(2)] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible. * * * Thus, it is the intent of the conferees

---

amenities are considered in the calculus of project development and decisionmaking. Subsection 102(c) establishes a procedure designed to insure that in instances where a proposed major Federal action would have a significant impact on the environment that the impact has in fact been considered, that any adverse effects which cannot be avoided are justified by some other stated consideration of national policy, that short-term uses are consistent with long-term productivity, and that any irreversible and irretrievable commitments of resources are warranted." 115 Cong.Rec. (Part 21) 29055 (1969).

10. The Commission, arguing before this court, has mistakenly confused the two standards, using the § 101(b) language to suggest that it has broad discretion in performance of § 102 procedural duties. We stress the necessity to separate the two, substantive and procedural, standards. *See* text at page 1128 *infra*.

11. The Senators' views are contained in "Major Changes in S. 1075 as Passed by the Senate," 115 Cong.Rec. (Part 30) at 40417–40418. The Representatives' views are contained in a separate statement filed with the Conference Report, 115 Cong.Rec. (Part 29) 39702–39703 (1969).

that the provision 'to the fullest extent possible' shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in section 102. Rather, the language in section 102 is intended to assure that all agencies of the Federal Government shall comply with the directives set out in said section 'to the fullest extent possible' under their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance."

■ Thus the Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of *statutory* authority.[12] Considerations of administrative difficulty, delay or economic cost will not suffice to strip the section of its fundamental importance.

■ We conclude, then, that Section 102 of NEPA mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse. As one District Court has said of Section 102 requirements: "It is hard to imagine a clearer or stronger mandate to the Courts." [13]

In the cases before us now, we do not have to review a particular decision by

12. Section 104 of NEPA provides that the Act does not eliminate any duties already imposed by other "specific statutory obligations." Only when such specific obligations conflict with NEPA do agencies have a right under § 104 and the "fullest extent possible" language to dilute their compliance with the full letter and spirit of the Act. *See* text at page 1123 *infra*. Sections 103 and 105 also support the general interpretation that the "fullest extent possible" language exempts agencies from full compliance only when there is a conflict of statutory obligations. Section 103 provides for agency review of existing obligations in order to discover and, if possible, correct any conflicts. *See* text at pages 1020–1021 *infra*. And § 105 provides that "[t]he policies and goals set forth in this Act are supplementary to those set forth in existing authorizations of Federal agencies." The report of the House conferees states that § 105 "does not * * * obviate the requirement that the Federal agencies conduct their activities in accordance with the provisions of this bill unless to do so would clearly violate their existing statutory obligations." 115 Cong.Rev. (Part 29) at 39703. The section-by-section analysis by the Senate conferees makes exactly the same point in slightly different language. 115 Cong.Rec. (Part 30) at 40418. The guidelines published by the Council on Environmental Quality state that "[t]he phrase 'to the fullest extent possible' * * * is meant to make clear that each agency of the Federal Government shall comply with the requirement unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible." 36 Fed. Reg. at 7724.

13. Texas Committee on Natural Resources v. United States, W.D.Tex., 1 Envir. Rpts—Cas. 1303, 1304 (1970). A few of the courts which have considered NEPA to date have made statements stressing the discretionary aspects of the Act. *See, e. g.*, Pennsylvania Environmental Council v. Bartlett, M.D.Pa., 315 F.Supp. 238 (1970); Bucklein v. Volpe, N.D.Cal., 2 Envir. Rpts—Cas. 1082, 1083 (1970). The Commission and intervenors rely upon these statements quite heavily. However, their reliance is misplaced, since the courts in question were not referring to the *procedural* duties created by NEPA. Rather, they were concerned with the Act's substantive goals or with such peripheral matters as retroactive application of the Act.

The general interpretation of NEPA which we outline in text at page 1112 *supra* is fully supported by the scholarly commentary. *See, e. g.*, Donovan, The Federal Government and Environmental Control: Administrative Reform on the Executive Level, 12 B.C.Ind. & Com.L.Rev. 541 (1971); Hanks & Hanks, An Environmental Bill of Rights: The Citizen Suit and the National Environmental Policy Act of 1969, 24 Rutg.

**1116**

the Atomic Energy Commission granting a construction permit or an operating license. Rather, we must review the Commission's recently promulgated rules which govern consideration of environmental values in all such individual decisions.[14] The rules were devised strictly in order to comply with the NEPA procedural requirements—but petitioners argue that they fall far short of the congressional mandate.

The period of the rules' gestation does not indicate overenthusiasm on the Commission's part. NEPA went into effect on January 1, 1970. On April 2, 1970—three months later—the Commission issued its first, short policy statement on implementation of the Act's procedural provisions.[15] After another span of two months, the Commission published a notice of proposed rule making in the Federal Register.[16] Petitioners submitted substantial comments critical of the proposed rules. Finally, on December 3, 1970, the Commission terminated its long rule making proceeding by issuing a formal amendment, labelled Appendix D, to its governing regulations.[17] Appendix D is a somewhat revised version of the earlier proposal and, at last, commits the Commission to consider environmental impact in its decision making process.

The procedure for environmental study and consideration set up by the Appendix D rules is as follows: Each applicant for an initial construction permit must submit to the Commission his

own "environmental report," presenting his assessment of the environmental impact of the planned facility and possible alternatives which would alter the impact. When construction is completed and the applicant applies for a license to operate the new facility, he must again submit an "environmental report" noting any factors which have changed since the original report. At each stage, the Commission's regulatory staff must take the applicant's report and prepare its own "detailed statement" of environmental costs, benefits and alternatives. The statement will then be circulated to other interested and responsible agencies and made available to the public. After comments are received from those sources, the staff must prepare a final "detailed statement" and make a final recommendation on the application for a construction permit or operating license.

Up to this point in the Appendix D rules petitioners have raised no challenge. However, they do attack four other, specific parts of the rules which, they say, violate the requirements of Section 102 of NEPA. Each of these parts in some way limits full consideration and individualized balancing of environmental values in the Commission's decision making process. (1) Although environmental factors must be considered by the agency's regulatory staff under the rules, such factors need not be considered by the hearing board conducting an independent review of staff recommenda-

L.Rev. 231 (1970); Sive, Some Thoughts of an Environmental Lawyer in the Wilderness of Administrative Law, 70 Colum. L.Rev. 612, 643–650 (1970); Peterson, An Analysis of Title I of the National Environmental Policy Act of 1969, 1 Envir.L.Rptr. 50035 (1971); Yannacone, National Environmental Policy Act of 1969, 1 Envir.Law 8 (1970); Note, The National Environmental Policy Act: A Sheep in Wolf's Clothing?, 37 Brooklyn L.Rev. 139 (1970).

14. In Case No. 24,871, petitioners attack four aspects of the Commission's rules, which are outlined in text. In Case No. 24,839, they challenge a particular application of the rules in the granting of a particular construction permit—that for

the Calvert Cliffs Nuclear Power Plant. However, their challenge consists largely of an attack on the substance of one aspect of the rules also attacked in Case No. 24,871. Thus we are able to resolve both cases together, and our remand to the Commission for further rule making includes a remand for further consideration relating to the Calvert Cliffs Plant in Case No. 24,839. *See* Part V of this opinion, *infra*.

15. 35 Fed.Reg. 5463 (April 2, 1970).

16. 35 Fed.Reg. 8594 (June 3, 1970).

17. 35 Fed.Reg. 18469 (December 4, 1970). The version of the rules finally adopted is now printed in 10 C.F.R. § 50, App. D, pp. 246–250 (1971).

tions, unless affirmatively raised by outside parties or staff members. (2) Another part of the procedural rules prohibits any such party from raising nonradiological environmental issues at any hearing if the notice for that hearing appeared in the Federal Register before March 4, 1971. (3) Moreover, the hearing board is prohibited from conducting an independent evaluation and balancing of certain environmental factors if other responsible agencies have already certified that their own environmental standards are satisfied by the proposed federal action. (4) Finally, the Commission's rules provide that when a construction permit for a facility has been issued before NEPA compliance was required and when an operating license has yet to be issued, the agency will not formally consider environmental factors or require modifications in the proposed facility until the time of the issuance of the operating license. Each of these parts of the Commission's rules will be described at greater length and evaluated under NEPA in the following sections of this opinion.

## II

NEPA makes only one specific reference to consideration of environmental values in agency review processes. Section 102(2) (C) provides that copies of the staff's "detailed statement" and comments thereon "shall accompany the proposal through the existing agency review processes." The Atomic Energy Commission's rules may seem in technical compliance with the letter of that provision. They state:

"12. If any party to a proceeding * * * raises any [environmental] issue * * * the Applicant's Environmental Report and the Detailed Statement will be offered in evidence. The atomic safety and licensing board will make findings of fact on, and resolve, the matters in controversy among the parties with regard to those issues. Depending on the resolution of those issues, the permit or license may be granted, denied, or appropriately conditioned to protect environmental values.

"13. When no party to a proceeding * * * raises any [environmental] issue * * * such issues will not be considered by the atomic safety and licensing board. Under such circumstances, although the Applicant's Environmental Report, comments thereon, and the Detailed Statement will accompany the application through the Commission's review processes, they will not be received in evidence, and the Commission's responsibilities under the National Environmental Policy Act of 1969 will be carried out in toto outside the hearing process." [18]

The question here is whether the Commission is correct in thinking that its NEPA responsibilities may "be carried out in toto outside the hearing process" —whether it is enough that environmental data and evaluations merely "accompany" an application through the review process, but receive no consideration whatever from the hearing board.

We believe that the Commission's crabbed interpretation of NEPA makes a mockery of the Act. What possible purpose could there be in the Section 102 (2) (C) requirement (that the "detailed statement" accompany proposals through agency review processes) if "accompany" means no more than physical proximity—mandating no more than the physical act of passing certain folders and papers, unopened, to reviewing officials along with other folders and papers? What possible purpose could there be in requiring the "detailed statement" to be before hearing boards, if the boards are free to ignore entirely the contents of the statement? NEPA was meant to do more than regulate the flow of papers in the federal bureaucracy. The word "accompany" in Section 102(2) (C) must not be read so narrowly as to make the Act ludicrous. It must, rather, be read to indicate a congressional intent

18. 10 C.F.R. § 50, App. D, at 249.

that environmental factors, as compiled in the "detailed statement," be *considered* through agency review processes.[19]

Beyond Section 102(2) (C), NEPA requires that agencies consider the environmental impact of their actions "to the fullest extent possible." The Act is addressed to agencies as a whole, not only to their professional staffs. Compliance to the *"fullest"* possible extent would seem to demand that environmental issues be considered at every important stage in the decision making process concerning a particular action—at every stage where an overall balancing of environmental and nonenvironmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs. Of course, consideration which is entirely duplicative is not necessarily required. But independent review of staff proposals by hearing boards is hardly a duplicative function. A truly independent review provides a crucial check on the staff's recommendations. The Commission's hearing boards automatically consider nonenvironmental factors, even though they have been previously studied by the staff. Clearly, the review process is an appropriate stage at which to balance conflicting factors against one another. And, just as clearly, it provides an important opportunity to reject or significantly modify the staff's recommended action. Environmental factors, therefore, should not be singled out and excluded, at this stage, from the proper balance of values envisioned by NEPA.

■ The Commission's regulations provide that in an uncontested proceeding the hearing board shall on its own "determine whether the application and the record of the proceeding contain sufficient information, and the review of the application by the Commission's regulatory staff has been adequate, to support affirmative findings on" various nonenvironmental factors.[20] NEPA requires at least as much automatic consideration of environmental factors. In uncontested hearings, the board need not necessarily go over the same ground covered in the "detailed statement." But it must at least examine the statement carefully to determine whether "the review * * * by the Commission's regulatory staff has been adequate." And it must independently consider the final balance among conflicting factors that is struck in the staff's recommendation.

The rationale of the Commission's limitation of environmental issues to hearings in which parties affirmatively raise those issues may have been one of economy. It may have been supposed that, whenever there are serious environmental costs overlooked or uncorrected by the staff, some party will intervene to bring those costs to the hearing board's attention. Of course, independent review of the "detailed statement" and independent balancing of factors in an uncontested hearing will take some time. If it is done properly, it will take a significant amount of time. But all of the NEPA procedures take time. Such administrative costs are not enough to undercut the Act's requirement that environmental protection be considered "to the fullest extent possible," *see* text at page 1114, *supra.* It is, moreover, unrealistic to assume that there will always be an intervenor with the information, energy and money required to challenge a staff recommendation which ig-

---

19. The guidelines issued by the Council on Environmental Quality emphasize the importance of consideration of alternatives to staff recommendations during the agency review process: "A rigorous exploration and objective evaluation of alternative actions that might avoid some or all of the adverse environmental effects is essential. Sufficient analysis of such alternatives and their costs and impact on the environment should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects." 36 Fed.Reg. at 7725. The Council also states that an objective of its guidelines is "to assist agencies in implementing not only the letter, but the spirit, of the Act." *Id.* at 7724.

20. 10 C.F.R. § 2.104(b) (2) (1971).

nores environmental costs. NEPA establishes environmental protection as an integral part of the Atomic Energy Commission's basic mandate. The primary responsibility for fulfilling that mandate lies with the Commission. Its responsibility is not simply to sit back, like an umpire, and resolve adversary contentions at the hearing stage. Rather, it must itself take the initiative of considering environmental values at every distinctive and comprehensive stage of the process beyond the staff's evaluation and recommendation.[21]

### III

Congress passed the final version of NEPA in late 1969, and the Act went into full effect on January 1, 1970. Yet the Atomic Energy Commission's rules prohibit any consideration of environmental issues by its hearing boards at proceedings officially noticed before March 4, 1971.[22] This is 14 months after the effective date of NEPA. And the hearings affected may go on for as much as a year longer until final action is taken. The result is that major federal actions having a significant environmental impact may be taken by the Commission, without full NEPA compliance, more than two years after the Act's ef-

fective date. In view of the importance of environmental consideration during the agency review process, *see* Part II *supra*, such a time lag is shocking.

The Commission explained that its very long time lag was intended "to provide an orderly period of transition in the conduct of the Commission's regulatory proceedings and to avoid unreasonable delays in the construction and operation of nuclear power plants urgently needed to meet the national requirements for electric power." [23] Before this court, it has claimed authority for its action, arguing that "the statute did not lay down detailed guidelines and inflexible timetables for its implementation; and we find in it no bar to agency provisions which are designed to accommodate transitional implementation problems." [24]

Again, the Commission's approach to statutory interpretation is strange indeed—so strange that it seems to reveal a rather thoroughgoing reluctance to meet the NEPA procedural obligations in the agency review process, the stage at which deliberation is most open to public examination and subject to the participation of public intervenors. The Act, it is true, lacks an "inflexible timetable" for its implementation. But it does have a clear effective date, consist-

---

21. In recent years, the courts have become increasingly strict in requiring that federal agencies live up to their mandates to consider the public interest. They have become increasingly impatient with agencies which attempt to avoid or dilute their statutorily imposed role as protectors of public interest values beyond the narrow concerns of industries being regulated. *See, e. g.,* Udall v. FPC, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967); Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584 (1971); Moss v. C. A. B., 139 U.S.App.D.C. 150, 430 F.2d 891 (1970); Environmental Defense Fund, Inc. v. U. S. Dept. of H. E. & W., 138 U.S.App.D.C. 381, 428 F.2d 1083 (1970). In commenting on the Atomic Energy Commission's pre-NEPA duty to consider health and safety matters, the Supreme Court said "the responsibility for safeguarding that health and safety belongs under the statute to the Commis-

sion." Power Reactor Development Co. v. International Union of Elec., Radio and Mach. Workers, 367 U.S. 396, 404, 81 S.Ct. 1529, 1533, 6 L.Ed.2d 924 (1961). The Second Circuit has made the same point regarding the Federal Power Commission: "In this case, as in many others, the Commission has claimed to be the representative of the public interest. This role does not permit it to act as an umpire blandly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission." Scenic Hudson Preservation Conference v. FPC, 2 Cir., 354 F.2d 608, 620 (1965).

22. 10 C.F.R. § 50, App. D, at 249.

23. 35 Fed.Reg. 18470 (December 4, 1970).

24. Brief for respondents in No. 24,871 at 49.

ently enforced by reviewing courts up to now. Every federal court having faced the issues has held that the procedural requirements of NEPA must be met in order to uphold federal action taken after January 1, 1970.[25] The absence of a "timetable" for compliance has never been held sufficient, in itself, to put off the date on which a congressional mandate takes effect. The absence of a "timetable," rather, indicates that compliance is required forthwith.

The only part of the Act which even implies that implementation may be subject, in some cases, to some significant delay is Section 103. There, Congress provided that all agencies must review "their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance" with NEPA. Agencies finding some such insuperable difficulty are obliged to "propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this Act."

The Commission, however, cannot justify its time lag under these Section 103 provisions. Indeed, it has not attempted to do so; only intervenors have raised the argument. Section 103 could support a substantial delay only by an agency which in fact discovered an insuperable barrier to compliance with the Act and required time to formulate and propose the needed reformative measures.

The actual review of existing statutory authority and regulations cannot be a particularly lengthy process for experienced counsel of a federal agency. Of course, the Atomic Energy Commission discovered no obstacle to NEPA implementation. Although it did not report its conclusion to the President until October 2, 1970, that nine-month delay (January to October) cannot justify so long a period of noncompliance with the Act. It certainly cannot justify a further delay of compliance until March 4, 1971.

No doubt the process formulating procedural rules to implement NEPA takes some time. Congress cannot have expected that federal agencies would immediately begin considering environmental issues on January 1, 1970. But the effective date of the Act does set a time for agencies to begin adopting rules and it demands that they strive, "to the fullest extent possible," to be prompt in the process. The Atomic Energy Commission has failed in this regard.[26] Consideration of environmental issues in the agency review process, for example, is quite clearly compelled by the Act.[27] The Commission cannot justify its 11-month delay in adopting rules on this point as part of a difficult, discretionary effort to decide whether or not its hearing boards should deal with environmental questions at all.

Even if the long delay had been necessary, however, the Commission would not be relieved of all NEPA responsibility to hold public hearings on the environmental consequences of actions taken between January 1, 1970 and final adop-

25. In some cases, the courts have had a difficult time determining whether particular federal actions were "taken" before or after January 1, 1970. But they have all started from the basic rule that any action taken after that date must comply with NEPA's procedural requirements. See Note, Retroactive Application of the National Environmental Policy Act of 1969, 69 Mich.L.Rev. 732 (1971), and cases cited therein. Clearly, any hearing held between January 1, 1970 and March 4, 1971 which culminates in the grant of a permit or license is a federal action taken after the Act's effective date.

26. See text at page 1116 supra.

27. As early as March 5, 1970, President Nixon stated in an executive order that NEPA requires consideration of environmental factors at public hearings. Executive Order 11514, 35 Fed.Reg. 4247 (March 5, 1970). See also Part II of this opinion.

tion of the rules. Although the Act's effective date may not require instant compliance, it must at least require that NEPA procedures, once established, be applied to consider prompt alterations in the plans or operations of facilities approved without compliance.[28] Yet the Commission's rules contain no such provision. Indeed, they do not even apply to the hearings still being conducted at the time of their adoption on December 3, 1970—or, for that matter, to hearings initiated in the following three months. The delayed compliance date of March 4, 1971, then, cannot be justified by the Commission's long drawn out rule making process.

Strangely, the Commission has principally relied on more pragmatic arguments. It seems an unfortunate affliction of large organizations to resist new procedures and to envision massive roadblocks to their adoption. Hence the Commission's talk of the need for an "orderly transition" to the NEPA procedures. It is difficult to credit the Commission's argument that several months were needed to work the consideration of environmental values into its review process. Before the enactment of NEPA, the Commission already had regulations requiring that hearings include health, safety and radiological matters.[29] The introduction of environmen-

---

28. In Part V of this opinion, we hold that the Commission must promptly consider the environmental impact of projects initially approved before January 1, 1970 but not yet granted an operating license. We hold that the Commission may not wait until construction is entirely completed and consider environmental factors only at the operating license hearings; rather, before environmental damage has been irreparably done by full construction of a facility, the Commission must consider alterations in the plans. Much the same principle—of making alterations while they still may be made at relatively small expense—applies to projects approved without NEPA compliance *after* the Act's effective date. A total reversal of the basic decision to construct a particular facility or take a particular action may then be difficult, since substantial resources may already have been committed to the project. Since NEPA must apply to the project in some fashion, however, it is essential that it apply as effectively as possible—requiring alterations in parts of the project to which resources have not yet been inalterably committed at great expense.

One District Court has dealt with the problem of instant compliance with NEPA. It suggested another measure which agencies should take while in the process of developing rules. It said: "The NEPA does not require the impossible. Nor would it require, in effect, a moratorium on all projects which had an environmental impact while awaiting compliance with § 102(2) (B). It would suffice if the statement pointed out this deficiency. The decisionmakers could then determine whether any purpose

would be served in delaying the project while awaiting the development of such criteria." Environmental Defense Fund, Inc. v. Corps of Engineers, E.D.Ark., 325 F.Supp. 749, 758 (1971). Apparently, the Atomic Energy Commission did not even go this far toward *considering* the lack of a NEPA public hearing as a basis for delaying projects between the Act's effective date and adoption of the rules.

Of course, on the facts of these cases, we need not express any final view on the legal effect of the Commission's failure to comply with NEPA after the Act's effective date. Mere *post hoc* alterations in plans may not be enough, especially in view of the Commission's long delay in promulgating rules. Less than a year ago, this court was asked to review a refusal by the Atomic Energy Commission to consider environmental factors in granting a license. We held that the case was not yet ripe for review. But we stated: "If the Commission persists in excluding such evidence, it is courting the possibility that if error is found a court will reverse its final order, condemn its proceeding as so much waste motion, and order that the proceeding be conducted over again in a way that realistically permits de novo consideration of the tendered evidence." Thermal Ecology Must be Preserved v. AEC, 139 U.S.App.D.C. 366, 368, 433 F.2d 524, 526 (1970).

29. *See* 10 C.F.R. § 20 (1971) for the standards which the Commission had developed to deal with radioactive emissions which might pose health or safety problems.

tal matters cannot have presented a radically unsettling problem. And, in any event, the obvious sense of urgency on the part of Congress should make clear that a transition, however "orderly," must proceed at a pace faster than a funeral procession.

██ In the end, the Commission's long delay seems based upon what it believes to be a pressing national power crisis. Inclusion of environmental issues in pre-March 4, 1971 hearings might have held up the licensing of some power plants for a time. But the very purpose of NEPA was to tell federal agencies that environmental protection is as much a part of their responsibility as is protection and promotion of the industries they regulate. Whether or not the spectre of a national power crisis is as real as the Commission apparently believes, it must not be used to create a blackout of environmental consideration in the agency review process. NEPA compels a case-by-case examination and balancing of discrete factors. Perhaps there may be cases in which the need for rapid licensing of a particular facility would justify a strict time limit on a hearing board's review of environmental issues; but a blanket banning of such issues until March 4, 1971 is impermissible under NEPA.

### IV

The sweep of NEPA is extraordinarily broad, compelling consideration of any and all types of environmental impact of federal action. However, the Atomic Energy Commission's rules specifically exclude from full consideration a wide variety of environmental issues. First, they provide that no party may raise and the Commission may not independently examine any problem of water quality—perhaps the most significant impact of nuclear power plants. Rather, the Commission indicates that it will defer totally to water quality standards devised and administered by state agencies and approved by the federal government under the Federal Water Pollution Control Act.[30] Secondly, the rules provide for similar abdication of NEPA authority to the standards of other agencies:

"With respect to those aspects of environmental quality for which environmental quality standards and requirements have been established by authorized Federal, State, and regional agencies, proof that the applicant is equipped to observe and agrees to observe such standards and requirements will be considered a satisfactory showing that there will not be a significant, adverse effect on the environment. Certification by the appropriate agency that there is reasonable assurance that the applicant for the permit or license will observe such standards and requirements will be considered dispositive for this purpose." [31]

The most the Commission will do is include a condition in all construction permits and operating licenses requiring compliance with the water quality or other standards set by such agencies.[32] The upshot is that the NEPA procedures, viewed by the Commission as superfluous, will wither away in disuse, applied

---

30. 10 C.F.R. § 50, App. D, at 249. Appendix D does require that applicants' environmental reports and the Commission's "detailed statements" include "a discussion of the water quality aspects of the proposed action." *Id.* at 248. But, as is stated in text, it bars independent consideration of those matters by the Commission's reviewing boards at public hearings. It also bars the Commission from requiring—or even considering—any water protection measures not already required by the approving state agencies. *See* Note 31 *infra*.

The section of the Federal Water Pollution Control Act establishing a system of state agency certification is § 21, as amended in the Water Quality Improvement Act of 1970. 33 U.S.C.A. § 1171 (1970). In text below, this section is discussed as part of the Water Quality Improvement Act.

31. 10 C.F.R. § 50, App. D, at 249.

32. *Ibid.*

only to those environmental issues wholly unregulated by any other federal, state or regional body.

 We believe the Commission's rule is in fundamental conflict with the basic purpose of the Act. NEPA mandates a case-by-case balancing judgment on the part of federal agencies. In each individual case, the particular economic and technical benefits of planned action must be assessed and then weighed against the environmental costs; alternatives must be considered which would affect the balance of values. *See* text at page 1113 *supra*. The magnitude of possible benefits and possible costs may lie anywhere on a broad spectrum. Much will depend on the particular magnitudes involved in particular cases. In some cases, the benefits will be great enough to justify a certain quantum of environmental costs; in other cases, they will not be so great and the proposed action may have to be abandoned or significantly altered so as to bring the benefits and costs into a proper balance. The point of the individualized balancing analysis is to ensure that, with possible alterations, the optimally beneficial action is finally taken.

Certification by another agency that its own environmental standards are satisfied involves an entirely different kind of judgment. Such agencies, without overall responsibility for the particular federal action in question, attend only to one aspect of the problem: the magnitude of certain environmental costs. They simply determine whether those costs exceed an allowable amount. Their certification does not mean that they found no environmental damage whatever. In fact, there may be significant environmental damage (*e. g.*, water pollution), but not quite enough to violate applicable (*e. g.*, water quality) standards. Certifying agencies do not attempt to weigh that damage against the opposing benefits. Thus the balancing analysis remains to be done. It may be that the environmental costs, though passing prescribed standards, are none-theless great enough to outweigh the particular economic and technical benefits involved in the planned action. The only agency in a position to make such a judgment is the agency with overall responsibility for the proposed federal action— the agency to which NEPA is specifically directed.

The Atomic Energy Commission, abdicating entirely to other agencies' certifications, neglects the mandated balancing analysis. Concerned members of the public are thereby precluded from raising a wide range of environmental issues in order to affect particular Commission decisions. And the special purpose of NEPA is subverted.

Arguing before this court, the Commission has made much of the special environmental expertise of the agencies which set environmental standards. NEPA did not overlook this consideration. Indeed, the Act is quite explicit in describing the attention which is to be given to the views and standards of other agencies. Section 102 (2) (C) provides:

> "Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public * * *."

Thus the Congress was surely cognizant of federal, state and local agencies "authorized to develop and enforce environmental standards." But it provided, in Section 102(2) (C), only for full consultation. It most certainly did not authorize a total abdication to those agencies. Nor did it grant a license to disregard the main body of NEPA obligations.

Of course, federal agencies such as the Atomic Energy Commission may have specific duties, under acts other than NEPA, to obey particular environmental standards. Section 104 of NEPA makes clear that such duties are not to be ignored:

"Nothing in Section 102 or 103 shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency."

On its face, Section 104 seems quite unextraordinary, intended only to see that the general procedural reforms achieved in NEPA do not wipe out the more specific environmental controls imposed by other statutes. Ironically, however, the Commission argues that Section 104 in fact allows other statutes to wipe out NEPA.

Since the Commission places great reliance on Section 104 to support its abdication to standard setting agencies, we should first note the section's obvious limitation. It deals only with deference to such agencies which is compelled by "specific statutory obligations." The Commission has brought to our attention one "specific statutory obligation": the Water Quality Improvement Act of 1970 (WQIA).[33] That Act prohibits federal licensing bodies, such as the Atomic Energy Commission, from issuing licenses for facilities which pollute "the navigable waters of the United States" unless they receive a certification from the appropriate agency that compliance with applicable water quality standards is reasonably assured. Thus Section 104 applies in some fashion to consideration of water quality matters. But it definitely cannot support—indeed, it is not even relevant to—the Commission's wholesale abdication to the standards and certifications of any and all federal, state and local agencies dealing with matters other than water quality.

As to water quality, Section 104 and WQIA clearly require obedience to standards set by other agencies. But obedience does not imply total abdication. Certainly, the language of Section 104 does not authorize an abdication. It does not suggest that other "specific statutory obligations" will entirely replace NEPA. Rather, it ensures that three sorts of "obligations" will not be undermined by NEPA: (1) the obligation to "comply" with certain standards, (2) the obligation to "coordinate" or "consult" with certain agencies, and (3) the obligation to "act, or refrain from acting contingent upon" a certification from certain agencies. WQIA imposes the third sort of obligation. It makes the granting of a license by the Commission "contingent upon" a water quality certification. But it does not *require* the Commission to grant a license once a certification has been issued. It does not preclude the Commission from demanding water pollution controls from its licensees which are *more strict* than those demanded by the applicable water quality standards of the certifying agency.[34] It is very important to understand

---

33. The relevant portion is 33 U.S.C.A. § 1171. *See* Note 30 *supra*.

34. The relevant language in WQIA seems carefully to avoid any such restrictive implication. It provides that "[e]ach Federal agency * * * shall * * * insure compliance with applicable water quality standards * * *." 33 U.S.C.A. § 1171(a). It also provides that "[n]o license or permit shall be granted until the certification required by this section has been obtained or has been waived * * *. No license or permit shall be granted if certification has been denied * * *." 33 U.S.C.A. § 1171(b) (1). Nowhere does it indicate that certification must be the final and only protection against unjustified water pollution—a fully sufficient as well as a necessary condition for issuance of a federal license or permit.

We also take note of § 21(c) of WQIA, which states: "Nothing in this section shall be construed to limit the authority of any department or agency pursuant to

these facts about WQIA. For all that Section 104 of NEPA does is to reaffirm other "specific statutory obligations." Unless those obligations are plainly mutually exclusive with the requirements of NEPA, the specific mandate of NEPA must remain in force. In other words, Section 104 can operate to relieve an agency of its NEPA duties only if other "specific statutory obligations" clearly preclude performance of those duties.

 Obedience to water quality certifications under WQIA is not mutually exclusive with the NEPA procedures. It does not preclude performance of the NEPA duties. Water quality certifications essentially establish a *minimum condition* for the granting of a license. But they need not end the matter. The Commission can then go on to perform the very different operation of balancing the overall benefits and costs of a particular proposed project, and consider alterations (above and beyond the applicable water quality standards) which would further reduce environmental damage. Because the Commission *can* still conduct the NEPA balancing analysis, consistent with WQIA, Section 104 does not exempt it from doing so. And it, therefore, *must* conduct the obligatory analysis under the prescribed procedures.

We believe the above result follows from the plain language of Section 104 of NEPA and WQIA. However, the Commission argues that we should delve beneath the plain language and adopt a significantly different interpretation. It relies entirely upon certain statements made by Senator Jackson and Senator Muskie, the sponsors of NEPA and WQIA respectively.[35] Those statements indicate that Section 104 was the product of a compromise intended to eliminate any conflict between the two bills then in the Senate. The overriding purpose was to prevent NEPA from eclipsing obedience to more specific standards under WQIA. Senator Muskie, distrustful of "self-policing by Federal agencies which pollute or license pollution," was particularly concerned that NEPA not undercut the independent role of standard setting agencies.[36] Most of his and Senator Jackson's comments stop short of suggesting that NEPA would have *no* application in water quality matters; their goal was to protect WQIA, not to undercut NEPA. Our interpretation of Section 104 is perfectly consistent with that purpose.

Yet the statements of the two Senators occasionally indicate they were willing to go farther, to permit agencies such as the Atomic Energy Commission to forego at least some NEPA procedures in consideration of water quality. Senator Jackson, for example, said, "The compromise worked out between the bills provides that the licensing agency will not have to make a detailed statement on water quality if the State or other appropriate agency has made a certification pursuant to [WQIA]."[37]

---

any other provision of law to require compliance with applicable water quality standards. * * * *" 33 U.S.C.A. § 1171 (c).

35. The statements by Senators Jackson and Muskie were made, first, at the time the Senate originally considered WQIA. 115 Cong.Rec. (Part 21) at 29052–29056. Another relevant colloquy between the two Senators occurred when the Senate considered the Conference Report on NEPA. 115 Cong.Rec. (Part 30) at 40415–40425. Senator Muskie made a further statement at the time of final Senate approval of the Conference Report on WQIA. 116 Cong.Rec. (daily ed.) S4401 (March 24, 1970).

36. 115 Cong.Rec. (Part 21) at 29053.

37. *Ibid. See also id.* at 29056. Senator Jackson appears not to have ascribed major importance to the compromise. He said, "It is my understanding that there was never any conflict between this section [of WQIA] and the provisions of [NEPA]. If both bills were enacted in their present form, there would be a requirement for State certification, as well as a requirement that the licensing agency make environmental findings." *Id.* at 29053. He added, "The agreed-upon changes mentioned previously would change the language of some of these requirements, but their substance would remain relatively unchanged." *Id.* at

Perhaps Senator Jackson would have required some consideration and balancing of environmental costs—despite the lack of a formal detailed statement—but he did not spell out his views. No Senator, other than Senators Jackson and Muskie, addressed himself specifically to the problem during floor discussion. Nor did any member of the House of Representatives.[38] The section-by-section analysis of NEPA submitted to the Senate clearly stated the overriding purpose of Section 104: that "no agency may substitute the procedures outlined in this Act for more restrictive and specific procedures established by law governing its activities."[39] The report does not suggest there that NEPA procedures should be entirely abandoned, but rather that they should not be "substituted" for more specific standards. In one rather cryptic sentence, the analysis does muddy the waters somewhat, stating that "[i]t is the intention that where there is no more effective procedure already established, the procedure of this act will be followed."[40] Notably, however, the sentence does not state that in the presence of "more effective procedures" the NEPA procedure will be abandoned entirely. It seems purposefully vague, quite possibly meaning that obedience to the certifications of standard setting agencies must alter, by supplementing, the *normal* "procedure of this act."

This rather meager legislative history, in our view, cannot radically transform the purport of the plain words of Section 104. Had the Senate sponsors fully intended to allow a total abdication of NEPA responsibilities in water quality matters—rather than a supplementing of them by strict obedience to the specific

standards of WQIA—the language of Section 104 could easily have been changed. As the Supreme Court often has said, the legislative history of a statute (particularly such relatively meager and vague history as we have here) cannot radically affect its interpretation if the language of the statute is clear. *See, e. g.*, Packard Motor Car Co. v. NLRB, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); Kuehner v. Irving Trust Co., 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340 (1937); Fairport, Painesville & Eastern R. Co. v. Meredith, 292 U.S. 589, 54 S.Ct. 826, 78 L.Ed. 1446 (1934); Wilbur v. United States ex rel. Vindicator Consolidated Gold Mining Co., 284 U.S. 231, 52 S.Ct. 113, 76 L.Ed. 261 (1931). In a recent case interpreting a veterans' act, the Court set down the principle which must govern our approach to the case before us:

"Having concluded that the provisions of § 1 are clear and unequivocal on their face, we find no need to resort to the legislative history of the Act. Since the State has placed such heavy reliance upon that history, however, we do deem it appropriate to point out that this history is at best inconclusive. It is true, as the State points out, that Representative Rankin, as Chairman of the Committee handling the bill on the floor of the House, expressed his view during the course of discussion of the bill on the floor that the 1941 Act would not apply to [the sort of case in question] * * *. But such statements, even when they stand alone, have never been regarded as sufficiently compelling to justify deviation from the plain language of a statute. * * *"

29055. Senator Muskie seemed to give greater emphasis to the supposed conflict between the two bills. *See id.* at 29053; 115 Cong.Rec. (Part 30) at 40425; 116 Cong.Rec. (daily ed.) at S4401.

38. The Commission has called to our attention remarks made by Congressman Harsha. The Congressman did refer to a statement by Senator Muskie regarding

NEPA, but it was a statement regarding application of the Act to established environmental control agencies, not regarding the relationship between NEPA and WQIA. 115 Cong.Rec. (Part 30) at 40927–40928.

39. *Id.* at 40420.

40. *Ibid.*

United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961). (Footnotes omitted.) It is, after all, the plain language of the statute which *all* the members of both houses of Congress must approve or disapprove. The courts should not allow that language to be significantly undercut. In cases such as this one, the most we should do to interpret clear statutory wording is to see that the *overriding purpose* behind the wording supports its plain meaning. We have done that here. And we conclude that Section 104 of NEPA does not permit the sort of total abdication of responsibility practiced by the Atomic Energy Commission.

### V

Petitioners' final attack is on the Commission's rules governing a particular set of nuclear facilities: those for which construction permits were granted without consideration of environmental issues, but for which operating licenses have yet to be issued. These facilities, still in varying stages of construction, include the one of most immediate concern to one of the petitioners: the Calvert Cliffs nuclear power plant on Chesapeake Bay in Maryland.

The Commission's rules recognize that the granting of a construction permit before NEPA's effective date does not justify bland inattention to environmental consequences until the operating license proceedings, perhaps far in the future. The rules require that measures be taken *now* for environmental protection. Specifically, the Commission has provided for three such measures during the pre-operating license stage. First, it has required that a condition be added to all construction permits, "whenever issued," which would oblige the holders of the permits to observe all applicable environmental standards imposed by federal or state law. Second, it has required permit holders to submit their own environmental report on the facility under construction. And third, it has initiated procedures for the drafting of its staff's "detailed environmental statement" in advance of operating license proceedings.[41]

The one thing the Commission has refused to do is take any independent action based upon the material in the environmental reports and "detailed statements." Whatever environmental damage the reports and statements may reveal, the Commission will allow construction to proceed on the original plans. It will not even consider requiring alterations in those plans (beyond compliance with external standards which would be binding in any event), though the "detailed statements" must contain an analysis of possible alternatives and may suggest relatively inexpensive but highly beneficial changes. Moreover, the Commission has, as a blanket policy, refused to consider the possibility of temporarily halting construction in particular cases pending a full study of a facility's environmental impact. It has also refused to weigh the pros and cons of "backfitting" for particular facilities (alteration of already constructed portions of the facilities in order to incorporate new technological developments designed to protect the environment). Thus reports and statements will be produced, but nothing will be done with them. Once again, the Commission seems to believe that the mere drafting and filing of papers is enough to satisfy NEPA.

The Commission appears to recognize the severe limitation which its rules impose on environmental protection. Yet it argues that full NEPA consideration of alternatives and independent action would cause too much delay at the pre-operating license stage. It justifies its rules as the most that is "practicable, in the light of environmental needs and 'other essential considerations of national policy'."[42] It cites, in particular, the "national power crisis" as a considera-

---

41. 10 C.F.R. § 50, App. D, ¶¶ 1, 14.

42. Brief for respondents in No. 24,871 at 59.

tion of national policy militating against delay in construction of nuclear power facilities.

 The Commission relies upon the flexible NEPA mandate to "use all practicable means consistent with other essential considerations of national policy." As we have previously pointed out, however, that mandate applies only to the substantive guidelines set forth in Section 101 of the Act. *See* page 1114 *supra*. The procedural duties, the duties to give full *consideration* to environmental protection, are subject to a much more strict standard of compliance. By now, the applicable principle should be absolutely clear. NEPA requires that an agency must—to the *fullest* extent possible under its other statutory obligations—consider alternatives to its actions which would reduce environmental damage. That principle establishes that consideration of environmental matters must be more than a *pro forma* ritual. Clearly, it is pointless to "consider" environmental costs without also seriously considering action to avoid them. Such a full exercise of substantive discretion is required at every important, appropriate and nonduplicative stage of an agency's proceedings. *See* text at page 1114 *supra*.

The special importance of the pre-operating license stage is not difficult to fathom. In cases where environmental costs were not considered in granting a construction permit, it is very likely that the planned facility will include some features which do significant damage to the environment and which could not have survived a rigorous balancing of costs and benefits. At the later operating license proceedings, this environmental damage will have to be fully considered. But by that time the situation will have changed radically. Once a facility has been completely constructed, the economic cost of any alteration may be very great. In the language of NEPA, there is likely to be an "irreversible and irretrievable commitment of resources," which will inevitably restrict the Commission's options. Either the licensee will have to undergo a major expense in making alterations in a completed facility or the environmental harm will have to be tolerated. It is all too probable that the latter result would come to pass.

By refusing to consider requirement of alterations until construction is completed, the Commission may effectively foreclose the environmental protection desired by Congress. It may also foreclose rigorous consideration of environmental factors at the eventual operating license proceedings. If "irreversible and irretrievable commitment[s] of resources" have already been made, the license hearing (and any public intervention therein) may become a hollow exercise. This hardly amounts to consideration of environmental values "to the fullest extent possible."

A full NEPA consideration of alterations in the original plans of a facility, then, is both important and appropriate well before the operating license proceedings. It is not duplicative if environmental issues were not considered in granting the construction permit. And it need not be duplicated, absent new information or new developments, at the operating license stage. In order that the pre-operating license review be as effective as possible, the Commission should consider very seriously the requirement of a temporary halt in construction pending its review and the "backfitting" of technological innovations. For no action which might minimize environmental damage may be dismissed out of hand. Of course, final operation of the facility may be delayed thereby. But some delay is inherent whenever the NEPA consideration is conducted—whether before or at the license proceedings. It is far more consistent with the purposes of the Act to delay operation at a stage where real environmental protection may come about than at a stage where corrective action may be so costly as to be impossible.

 Thus we conclude that the Commission must go farther than it has in

its present rules. It must consider action, as well as file reports and papers, at the pre-operating license stage. As the Commission candidly admits, such consideration does not amount to a retroactive application of NEPA. Although the projects in question may have been commenced and initially approved before January 1, 1970, the Act clearly applies to them since they must still pass muster before going into full operation.[43] All we demand is that the environmental review be as full and fruitful as possible.

## VI

We hold that, in the four respects detailed above, the Commission must revise its rules governing consideration of environmental issues. We do not impose a harsh burden on the Commission. For we require only an exercise of substantive discretion which will protect the environment "to the fullest extent possible." No less is required if the grand congressional purposes underlying NEPA are to become a reality.

Remanded for proceedings consistent with this opinion.

## APPENDIX

Public Law 91–190
91st Congress, S. 1075
January 1, 1970
An Act

To establish a national policy for the environment, to provide for the establishment of a Council on Environmental Quality, and for other purposes.

---

43. The courts which have held NEPA to be nonretroactive have not faced situations like the one before us here—situations where there are two, distinct stages of federal approval, one occurring before the Act's effective date and one after that date. *See* Note, *supra* Note 25.

The guidelines issued by the Council on Environmental Quality urge agencies to employ NEPA procedures to minimize environmental damage, even when approval of particular projects was given before January 1, 1970: "To the maximum extent practicable the section 102(2) (C) procedure should be applied to further

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "National Environmental Policy Act of 1969."

## PURPOSE

Sec. 2. The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

## TITLE I

## DECLARATION OF NATIONAL ENVIRONMENTAL POLICY

Sec. 101. (a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and

---

major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of [NEPA] on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to mimimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program." 36 Fed.Reg. at 7727.

private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

Sec. 102. The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or spe-

cial expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by title II of this Act.

Sec. 103. All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this Act and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this Act.

Sec. 104. Nothing in Section 102 or 103 shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

Sec. 105. The policies and goals set forth in this Act are supplementary to those set forth in existing authorizations of Federal agencies.