**MORNINGSIDE–LENOX PARK ASSOCIATION, Inc., Plaintiff,**

v.

**John A. VOLPE, Individually and as Secretary of the Department of Transportation and Bert K. Lance, Individually and as Director of the Georgia State Highway Department, Defendants.**

**Civ. A. No. 15237.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Nov. 12, 1971.

---

Crosland & Padnos, Michael D. Padnos, Atlanta, Ga., for plaintiff.

Arthur K. Bolton, Atty. Gen., State of Georgia, John W. Stokes, Jr., U. S. Atty., N. D. Georgia, Beverly B. Bates, Asst. U. S. Atty., James D. Billett, Regional Counsel, Federal Highway Administration, Atlanta, Ga., for defendants.

### ORDER

MOYE, District Judge.

The institution of this suit is further testimony to the growing propensity of urban residents to battle with the planners and builders of urban highways.[1] At issue is the proposed location of an interstate highway in the Atlanta area, which highway has been in the planning and development stage for several years. The highway project has been opposed from its inception by the Morningside-Lenox Park Association, Inc., and this suit represents another effort by this local civic organization to halt further development or construction of that portion of the Interstate System designated as Interstate 485.

The complaint alleges that the planning, development, and construction of Interstate 485 have been and are being carried out in violation of several federal statutes, namely, (1) Section 102(2) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2) (C); (2) Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f) and Section 138 of the Federal Aid to Highways Act of 1968, 23 U.S.C. § 138; (3) 23 U.S.C. § 128; (4) Section 134 of the Federal Highway Act of 1962, 23 U.S.C. § 134; (5) 23 U.S.C. § 313; and (6) the Fifth, Ninth, and Fourteenth Amendments to the United States Constitution. The Court held a hearing on plaintiff's motion for a preliminary injunction and, upon defendants' representations that no further demolition or construction would take place before the Court ruled on the issues, the Court denied preliminary injunctive relief. Defendant Volpe was allowed 60 days to file the administrative record, and all parties were allowed the opportunity to file briefs on the legal issues involved. The State defendant filed an answer in which are raised various defenses. Both plaintiff and defendant Volpe have filed cross motions for summary judgment. Before discussing the contentions of the parties, it is necessary briefly to state the factual history of the proposed highway segment involved in this litigation.[2]

### FACTUAL BACKGROUND

The portion of the Georgia Interstate Highway System designated as Interstate 485 extends from the joint through-town sector of Interstate 75 and Interstate 85 near the Atlanta central business district easterly and northerly to the interchange of Interstate 85 and the proposed North Fulton Expressway (F-056), just south of Lenox Road. A section of highway 0.3 miles in length from the through-town sector of I–85 and I–75 east to Boulevard was constructed as project U–061–1(10)[3] and has been open

1. For examples of major cities throughout the nation which are engaged in urban highway controversies, see Aman, Urban Highways: The Problems of Route Location and a Proposed Solution, 47 Journal of Urban Law 817 at note 1 (1970). See also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 2d 136 (1971); Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept. et al., 446 F. 2d 1013 (5th Cir., dated August 5, 1971).

2. The primary source for the Court's exposition of the factual background is the lengthy affidavit of Herschel Bryant, Division Engineer (Georgia), Federal Highway Administration (FHWA).

3. A highway project which is designated as "F" or "FAP" is a federal-aid primary project which is jointly financed by the federal government in cooperation with

to traffic since 1964. On the remaining section of I-485, approximately $23,300,-000 has been authorized for expenditure for preliminary engineering and acquisition of right-of-way, and an additional amount of $6,300,000 is estimated for completion of preliminary engineering and right-of-way acquisition. Construction cost for the completion of I-485 is estimated at approximately $65,700,000, resulting in a total estimated cost of $95,300,000.

The location of I-485 is generally along the lines of two previously planned federal-aid highways, F-056 (North-South) and U-061 (East-West). In the latter part of 1964, the state submitted to the Washington Office of the Bureau of Public Roads a request for the addition of I-485 to the Interstate Highway System along the general corridor of F-056 from I-85 near Lenox Road southerly to I-75 near Stockbridge, with a 1.0 mile downtown connector from the through-town sector of I-75 and I-85 westerly along the general corridor of F-061. This request received initial approval of the Federal Highway Administrator on October 15, 1964 (Exhibit 37). Authorization was given by the Division Engineer (Georgia) of the Federal Highway Administration to the State Highway Department on November 20, 1964, to proceed with preliminary engineering to fix the location and prepare preliminary plans suitable for a public hearing (Exhibit 44). Right-of-way acquisition and demolition of improvements along the line from Boulevard to the junction of F-056 near Inman Park was already underway in 1964 as that line had been apparently approved by the FHWA in 1960 as a part of U-061.[4] The state recommended that I-485 be superimposed on this existing, approved line. From the junction of F-056 northerly to Saint Charles Avenue, the proposed location generally followed the location of the North Avenue Connector, a spur connection proposed as part of U-061. Between Saint Charles Avenue and I-85, the longest and, apparently, most controversial section of the highway, four alternative routes were studied and analyzed by state and federal highway officials. On July 15, 1965, a public hearing was held at the Atlanta Municipal Auditorium, at which hearing information was presented with regard to previous studies, and interested persons and groups were given the opportunity to express their views (Exhibit 74). After the hearing, two of the alternative routes from Saint Charles Avenue to I-85 (Lines C & D) were discarded, and the choices were narrowed to Lines B and E. In October, 1965, the location of I-485 between Boulevard and Saint Charles Avenue (a distance of about two miles) was approved by the Regional (Georgia) Office of the FHWA (Exhibit 83), and authorization was given for preliminary engineering for survey and plan preparation for this section (Exhibit 84). Authorization for right-of-way acquisition on this section was subsequently given on December 6, 1965, from Howell Street to Alaska Avenue and on May 3, 1966, from Alaska Avenue to Ponce de Leon Avenue (Exhibits 89 and 112).

With regard to the section between Saint Charles Avenue and I-85, the State Highway Department made additional studies of the two alternate routes (Lines B and E) and, on February 6, 1966, submitted to the Georgia Division of the FHWA a supplemental report on this section in which the state recommended that Line B be the final location. The state subsequently requested that no action be taken on its recommendation of Line B until further evaluation (requested by Governor

---

the state, with primary funds from the Highway Trust Fund. A project designated as "U" is a federal-aid highway project within the primary system in an urban area, financed with so-called "urban" funds from the Highway Trust Fund.

4. The only "evidence" that U-061 was approved in 1960 is the Affidavit of Herschel Bryant. There is no independent evidence of this fact in the administrative record.

Sanders) was made. On May 24, 1966, this further study was completed and the state submitted an "Amenities Evaluation Report" to the FHWA and reaffirmed its choice of Line B as the final location (Exhibit 116). The Washington Office of the FHWA, by telegram dated July 6, 1966, concurred in the state's recommendation of Line B as the location of I–485 from Saint Charles Avenue to I–85 (Exhibit 130). Preliminary engineering for survey and plan preparation for the entire length of I–485 was authorized on July 12, 1966 (Exhibit 133). It appears from the above facts, that, as of July 1966, the final location of the entire length of I–485 from the interchange of I–75 and I–85 to I–85 near Lenox Road was fixed and had been approved by the FHWA. The subsequent studies, planning, hearings and the like were concerned with the actual design of the highway.[5]

Studies and planning with regard to the design of the highway were continued by the State Highway Department on various sections of the highway. The Georgia Office of the FHWA apparently approved the major design features of the section between Boulevard and Ponce de Leon Avenue (just south of Saint Charles Avenue) on October 5, 1967 (Exhibit 171). Final right-of-way plans and acquisitions for this section were authorized on October 27, 1967 (Exhibits 172, 173, 174). Design plans for the section from Ponce de Leon Avenue to Cheshire Bridge Road (just south of I–85) were submitted by the state on April 8, 1968, and received initial approval by the Georgia FHWA on May 1, 1968 (Exhibits 189 and 190). It was agreed that additional right-of-ways would be acquired whenever feasible and possible for the development of green belts and mini-parks adjacent to the highway.

Special consideration was also given to lessening the adverse effects on Orme Park.

Pursuant to a revision in FHWA policy, which required a corridor public hearing and a design public hearing, and because of the controversial nature of the proposed highway, a design public hearing was held, on June 10, 1969, on the section of highway from Ponce de Leon Avenue to I–85, though the major design features and preliminary design plans had been previously approved. Subsequent to the design hearing, the Georgia Office of the FHWA gave "design approval" to this section on August 25, 1969 (Exhibits 269, 271).

On January 30, 1970, the Georgia Office of the FHWA advised the state that approval authority for federal-aid highway projects involving Section 4(f) matters (49 U.S.C. § 1653(f)) was vested in the Secretary of Transportation, and, for each project, a special report should be submitted for transmittal to the Office of the Secretary (Exhibit 306A). On April 29, 1970, the state submitted a Section 4(f) Study Report with regard to the crossing of Orme Park. Approval of the crossing of Orme Park was given by the Secretary of Transportation on February 9, 1971. (See Exhibits 354.) With regard to the area known as Madeira Park, the state informed the Georgia Office of the FHWA that this area had been acquired by the state on May 17, 1967, and no longer functioned as part of the Atlanta Parks System. Since the state acquired the park area prior to the effective date of Section 4(f), 49 U.S.C. § 1653(f), the area was no longer a part of the Atlanta Parks System, and the houses surrounding the park had been demolished, the Georgia Office of the FHWA concurred in the state's determination that a Section 4(f)

---

5. Attached to the administrative record is a glossary of pertinent terms and abbreviations. "Highway Design" is defined as "The orderly development of a roadway facility after the final location has been approved, and continuing through the economic, geometric, hydraulic, and structural design considerations." "Highway Location" is defined as "Roadway alignment based on studies of the physical features of various alternate locations, using all available data, to determine the proper fitting of the highway to the environment."

Study Report would not be required as to Madeira Park.

On December 9, 1970, the Georgia Office of the FHWA furnished the state with a copy of a "Draft Instructional Memorandum" relative to the implementation of the National Environmental Policy Act [hereinafter NEPA]. (This memorandum has since been superseded by PPM 90–1, dated August 24, 1971.) Pursuant to this memorandum, the state determined and the FHWA concurred that design approval was given on October 10, 1967, on the section from Boulevard to Ponce de Leon Avenue and on August 25, 1959, on the section from Ponce de Leon Avenue to the north limits of the I–85 interchange. Accordingly, the Georgia Office of the FHWA concurred in the state's assessment that the project was being developed so as to minimize adverse environmental consequences and that no environmental statement (pursuant to Section 102(2) of the NEPA) need be prepared. (See Exhibits 343 and 345.)[6]

## PROCEDURAL DEFENSES

■ Both defendants have raised several procedural defenses which must be determined before the merits of the complaint are considered. Defendant Volpe first seems to argue that, as a nonprofit civic organization having as one of its purposes the preservation of the Morningside-Lenox Park residential neighborhood, the plaintiff has no standing to object to alleged defects in the highway outside the neighborhood. In light of

Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir. 1970); and Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 728 (ED Ark.1971), the Court believes it can hardly be gainsaid that the plaintiff corporation has standing, under the Administrative Procedure Act, to assert the various challenges here, and the Court holds that it does have such standing.

■■ Defendant Volpe next argues that the plaintiff is collaterally estopped from asserting its claims here because of prior action against the state defendant in state court.[7] The doctrine of collateral estoppel operates to bar litigation of issues previously raised, litigated, and determined in a prior litigation. Moore v. United States, 120 U.S.App. D.C. 173, 344 F.2d 558 (1965); United States v. Glidden Co., 119 F.2d 235 (6th Cir. 1941); Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195 (1877); 1B J. Moore, Federal Practice, ¶ 0.441 [1], et seq. The Court does not believe the doctrine of collateral estoppel operates in favor of defendants in the instant case. In the prior state court suit, the Georgia Supreme Court specifically declined to consider whether or not the federal statute pleaded there had been complied with: "Federal regulations with respect to interstate highways must be complied with in order for the State to receive Federal funds, but such requirements do

---

6. The "Draft Instructional Memorandum" (Interim Guidelines for Implementation of Section 102(2) (C) of the NEPA) provides, in paragraph 4(b): "The provisions of this memorandum do not apply to projects that received or receive design approval before February 1, 1971."

7. In 1966, the plaintiff brought suit in Superior Court against the State Highway Department seeking certain declaratory relief and to enjoin the defendant from acquiring any right of way in, expending any moneys on, planning or constructing Highway I–485 along Route

"B". The state court complaint alleged that the State Highway Department had abused its discretion in selecting line "B" and that the selection of line "B" was contrary to Section 134 of the Federal Highway Act of 1962, 23 U.S.C. § 134. The Superior Court of Fulton County sustained the defendant's demurrers to the petition. The Supreme Court of Georgia determined that the complaint failed to state a cause of action and affirmed the Superior Court. Morningside-Lenox Park Association v. State Highway Department, 224 Ga. 344, 161 S.E.2d 859 (1968).

not limit or affect the authority of the State Highway Department to select location, construct and maintain highways in the State. Thus, once the appropriation has been approved, *it is not a matter for determination by this court as to whether or not such appropriation was made in conformity with the Federal regulations.* Plaintiff's allegations as to the failure to comply with a portion of the Federal Highway Act of 1962 and the guidelines promulgated thereunder are without substance." [8] As the issue of compliance with federal statutes and regulations was specifically not decided in the state court litigation, the doctrine of collateral estoppel does not preclude consideration of that issue in this case.[9] The recent decision in Township of Hopewell v. Volpe, 446 F.2d 167 (3d Cir. July 13, 1971), does not require a different result, for the state court in that case had clearly assumed jurisdiction of and ruled upon the issue of compliance with federal requirements.

In his answer, defendant Lance raises the defense of *res judicata* and argues that plaintiff is barred from raising the claims against the state defendant. The doctrine of *res judicata* precludes litigation in a second suit of all issues that were raised or could have been raised in the first suit.[10] Whatever might be said about other claims, it is clear that the plaintiff is not barred by *res judicata* from litigating its claim with regard to the National Environmental Policy Act of 1969. That claim was not raised in the prior state court action nor could it have been, since the law did not exist at the time of the state court proceedings. Plaintiff is not barred from litigating its claim, against the federal and state defendants, of noncompliance with the National Environmental Policy Act of 1969.[11] An analysis of that claim follows.

## NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

Of the several recent federal statutes which demonstrate a commitment by Congress to temper traditional enthusiasm for material progress with environmental considerations,[12] the National Environmental Policy Act of 1969 appears to be the most comprehensive. Characterized as "an environmental full disclosure law," [13] the Act requires all federal agencies, in performing their respective functions, to be responsive to possible environmental consequences of their actions. The Act makes it the "continuing" responsibility of the federal government to "use all practicable means and measures" to carry out the national policy of restoring and maintaining a quality environment. 42 U.S. C. § 4331(a), (b). To insure that the substantive provisions of the Act receive the attention they deserve, certain procedural measures are prescribed.

---

8. 224 Ga. at 346, 161 S.E.2d at 861 (emphasis added).

9. The only specific federal statute raised in the state court action was Section 134 of the Federal Highway Act of 1962, 23 U.S.C. § 134, whereas several other federal statutes are relied upon in the instant suit. The complaint in state court did allege, in several instances, that "federal" requirements were not complied with. None of the "federal questions", whether specifically pleaded or not, were decided by the state court.

10. See United States v. Burch, 294 F.2d 1, 5 n. 4 (5th Cir. 1961) ; 1B J. Moore, Federal Practice, ¶ 0.405 [1], et seq.

11. The effect of *res judicata* upon other claims raised by the plaintiff is discussed *infra*.

12. *E. g.,* Environmental Education Act, 20 U.S.C. § 1531 et seq. (1971 Pocket Part) ; Air Quality Act of 1967, 42 U.S.C. § 1857 et seq.; Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4372 et seq. (1971 Pocket Part) ; Water and Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4321 et seq. (1971 Pocket Part).

13. Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 728 (E.D.Ark.1971).

Section 102 [14] of the Act provides in pertinent part:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

"(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

"(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

"(C) include in every recommendation on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;"

While the substantive provisions allow for the responsible exercise of administrative discretion and require no particular substantive result in any one case, the procedural measures prescribed in Section 102 are not as flexible:

"[T]he Act also contains very important 'procedural' provisions—provisions which are designed to see that all federal agencies do in fact exercise the substantive discretion given them. These provisions are not highly flexible. Indeed, they establish a strict standard of compliance." [15]

The NEPA issue contested here centers around the interpretation of these "procedural" provisions.

It is undisputed here that no "Section 102 statement" was prepared with regard to the project in question. Defendant Volpe argues, however, that the NEPA is not applicable to this project because the basic planning, authorization, approvals and hearings occurred prior to the effective date of the Act—

14. 42 U.S.C. § 4332.

15. Calvert Cliffs Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109 (D.C.Cir. 1971).

January 1, 1970. In light of the recent refusal of several district courts to apply the NEPA to ongoing federal projects,[16] the government's position in this regard is not totally unfounded. Plaintiff, however, points to other cases in which the NEPA was applied to ongoing, even substantially completed, federal projects.[17] Because of the various, and often nebulous, approaches taken by the federal courts to the "applicability" issue, it is necessary to analyze those decisions here.

Section 102, by its terms, requires the "detailed [environmental] statement" to accompany " * * * major federal actions." Accordingly, some courts have focused upon a specific federal action or actions which occurred on a particular date or dates, and, if this action(s) was taken prior to the effective date of the NEPA, the Act was held inapplicable to that project. For example, in Pennsylvania Environmental Council, Inc. v. Bartlett,[18] an injunction was sought against the construction of a federal-aid highway on the grounds, *inter alia*, that the provisions of the NEPA were not complied with. The Court found that "all of the planning for the improvement of [the highway] occurred prior to [January 1, 1970]" and that construction contracts were awarded on December 29, 1969.[19] All that remained, the Court found, was the actual construction of the highway. The Court held that the NEPA was not designed to be given retroactive application and that, since the contract in question was awarded and finalized [2 days] prior to the effective date of the Act, no violation of the NEPA had occurred. Similarly, the Court in Brooks v. Volpe,[20] another high-

way location suit, also declined to apply the provisions of the NEPA:

"The administrative determination with respect to the highway location was made in 1967. To give effect to plaintiffs' contention would require a retrospective application of Section 102 [of the NEPA]. A statute will not be construed as restrospective, however, unless the Act clearly, by express language or necessary implication, indicates Congress so intended. It is the Court's view that the section in question operates only prospectively." [21]

Although citing *Brooks* and *Bartlett* for the proposition that the NEPA was not meant to be applied retroactively, the Court in Investment Syndicates, Inc. v. Richmond [22] appears to have emphasized the stage of completion of the project as the determining factor in its refusal to apply the NEPA:

"By January 1, 1970, when the President signed the National Environmental Policy Act of 1969, money had been appropriated for almost all phases of the project including most of the construction. The letting of the contract, clearing of the right-of-way and construction of the line itself, although occurring after January 1, 1970, are merely a small portion of the work required to complete the project. *I cannot believe that Congress intended that the NEPA apply to 'major Federal actions' which had reached this stage of completion as of the date of enactment. It was not the intention of Congress to negate all of the work which had gone into this project, including design and planning*

---

16. *E. g.*, Brooks v. Volpe, 319 F.Supp. 90 (W.D.Wash.1970) ; Investment Syndicates, Inc. v. Richmond, 318 F.Supp. 1038 (D.Ore.1970) ; Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F. Supp. 238 (M.D.Pa.1970).

17. *E. g.*, Named Individual Members of San Antonio Conservation Society, Inc. v. Texas Highway Dept. et al., *supra* note 1; Environmental Defense Fund, Inc. v. Corps of Engineers, *supra* note 13;

Calvert Cliffs Coordinating Committee, Inc. v. United States Atomic Energy Commission, *supra* note 15.

18. *Supra* note 16.

19. 315 F.Supp. at 247.

20. *Supra* note 16.

21. 319 F.Supp. at 92.

22. *Supra* note 16.

*costs, but to have it completed in an orderly manner.* To hold that the NEPA does apply to this project would be to give the statute retrospective effect. See Brooks v. Volpe, supra. To order a work stoppage while a report is being prepared would cause a large increase in cost to the taxpayers and most likely would have little or no effect on the location or design of the line. I therefore hold that the NEPA is not applicable to the project."

Against this background of case law, some federal courts, in lieu of emphasizing a particular federal action or actions which occurred before January 1, 1970, have focused upon other statutory language [of the NEPA] and have employed another approach to the applicability issue. In Environmental Defense Fund, Inc. v. Corps of Engineers,[23] [hereinafter *Defense Fund*], the district court held the provisions of the NEPA applicable to part of a federal project which had been authorized in 1958. The plaintiff in *Defense Fund* sought an injunction against the making of any contract or the doing of any work in furtherance of the plan of the defendants to construct a dam across the Cossatot River in the State of Arkansas. Construction of the dam was a part of a large public works project entitled "Millwood Reservoir and Alternate Reservoirs, Little River, Oklahoma and Arkansas." The total cost of the entire project was estimated at $14,800,000 of which at least $9,496,000 had been expended as of the time suit was brought. The overall "Millwood" project had been authorized by Congress in 1958 although work on the dam itself had not begun until 1963. Insofar as concerned total cost, approximately two-thirds of the

project had been completed although no actual construction work on the dam itself had yet been done. The defendants in *Defense Fund* argued that the NEPA did not apply and that, if it did, they had complied.[24] The Court, citing *Investment Syndicates, supra,* as an example, noted that defendants' "retroactivity" argument was not totally without judicial support but went on to say: "But here the plaintiffs are not asking the Court to set aside or undo any prior action on the part of the defendants. Rather they are seeking an application of prevailing, existing law related to anticipated future actions of the defendants." [25] Focusing upon the language in the Act which makes it "the *continuing* policy of the federal government" to protect the environment [26] and "the *continuing* responsibility of the Federal Government to * * * improve and coordinate federal plans * * * to accomplish that objective," [27] the Court stated: "[W]hile new plans and programs must be structured from the outset in accordance with the requirements of NEPA, it is also clear that the act requires the defendants to 'improve' or upgrade existing plans and programs to meet those requirements." [28] So as not to limit its attention merely to one portion of the Act, the Court noted the mandate that the substantive policies of the Act be implemented "to the fullest extent possible," [29] and, in concluding that this language "could hardly be considered ambiguous" [30] cited the legislative history of Section 102 of the Act:

"The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in such subparagraphs (A) through (H) unless the existing law applicable to such

---

23. *Supra* note 13.

24. After the commencement of the suit, defendants filed a statement purportedly in compliance with Section 102(2) (C) of the NEPA, which "statement" the Court rejected as insufficient.

25. 325 F.Supp. at 743.

26. Section 101(a), 42 U.S.C. § 4331 (emphasis added).

27. Section 101(b), 42 U.S.C. § 4331 (emphasis added).

28. 325 F.Supp. at 743.

29. Section 102, 42 U.S.C. § 4332.

30. *Supra* note 28.

agency's operations expressly prohibits or makes full compliance with one of the directives impossible. If such is found to be the case, then compliance with the particular directive is not immediately required. However, as to other activities of that agency, compliance is required. Thus, it is the intent of the conferees that the provision 'to the fullest extent possible' shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in section 102. Rather, the language in section 102 is intended to assure that all agencies of the Federal Government shall comply with the directives set out in said section 'to the fullest extent possible' under their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance." [31]

The Court finally cited the "interim guidelines" (for implementation of the NEPA) of the Council on Environmental Quality:

*"Application of Section 102(2) Procedure to Existing Projects and Programs.* To the fullest extent possible the section 102(2) (C) procedure should be applied to further major federal acts having a significant effect on the environment even though they arise from projects or programs initiated prior to the enactment of [NEPA]. Where it is not practicable to reassess the basic course of action it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in future action that account be taken of environmental consequences not fully evaluated at the outset of the project or program."

and correctly noted that "Such an administrative interpretation can not be ignored except for the strongest rea-

sons, particularly where, as here, such an interpretation involves a construction of a statute by the men charged with the responsibility of putting that statute into effect." [32] In holding that the defendants were required to prepare the environmental impact statement and otherwise comply with the requirements of Section 102 of the Act, the Court stated:

"The Court is not suggesting that the status of work should not be considered in determining whether to proceed with the project. It is suggesting that the degree of the completion of the work should not inhibit the objective and thorough evaluation of the environmental impact of the project as required by NEPA. Although the attitude of the defendants is understandable, nevertheless, as the Court interprets NEPA, the Congress of the United States is intent upon requiring the agencies of the United States government, such as the defendants here, to objectively evaluate all of their projects, *regardless of how much money has already been spent thereon and regardless of the degree of completion of the work."* [33]

The Court in *Defense Fund* has not been the only Court to require strict compliance with Section 102 of the NEPA. In Calvert Cliffs Coordinating Committee, Inc. v. United States Atomic Energy Commission,[34] the Court of Appeals for the District of Columbia had occasion to evaluate the NEPA in conjunction with rules promulgated by the Atomic Energy Commission regarding the issuance of construction permits and operating licenses for proposed federal power plants. The Commission's procedures for authorizing the construction and operation of a power plant involved two steps: (1) issuance of a construction permit and (2) issuance of an operating license. Insofar as concerned NEPA procedures, the Commission's

31. Conference Report 91–765, 2 U.S.C. Cong. and Admin.News at p. 2770 (1969).

32. *Supra* note 28. Citations omitted.

33. 325 F.Supp. at 746 (emphasis added).

34. *Supra* note 15.

rules provided that various environmental reports and papers were to be prepared prior to the operating license stage regardless of when the construction permit was issued. The crucial defect in the rules and practices, however, was that such environmental reports and studies were not *considered* until the operating license stage. Postponing consideration of possible environmental damage until after construction, the Court noted, rendered the NEPA procedures little more than a *pro forma* ritual: "Once a facility has been completely constructed, the economic cost of any alteration may be very great. In the language of NEPA, there is likely to be an 'irreversible and irretrievable commitment of resources', which will inevitably restrict the Commission's options. Either the licensee will have to undergo a major expense in making alterations in a completed facility or the environmental harm will have to be tolerated. It is all too probable that the latter result would come to pass." [35]

The decision in *Calvert Cliffs* is factually distinguishable from the instant case in that the situation in that case involved "two, distinct stages of federal approval, one occurring before the Act's effective date and one after that date." [36] The controversy in *Calvert* was not whether or not the NEPA procedures should be complied with but rather the time and manner of compliance. The same statutory language, legislative history and administrative interpretation relied upon by the Court in *Defense Fund,* however, was emphasized in *Calvert Cliffs.* Though in a context distinguishable from the instant case, it is clear that the degree of completion of construction was not an obstacle to the Court's application of the NEPA procedures. The statutory construction and reasoning of the Court cannot be discarded merely because it was employed in a different factual context.

In its first brief on the issue, plaintiff relied heavily upon the recent Fifth Circuit decision, San Antonio Conservation Society v. Texas Highway Dept. et al.[37] In *San Antonio,* the plaintiffs sought an injunction against the construction of a federal-aid expressway through the Brackenridge Olmos Parklands in San Antonio, Texas, on the grounds that various federal environmental protection laws were being violated. Insofar as the applicability of the NEPA was concerned, the Court found that, since the Secretary of Transportation's approval of federal funding occurred on August 13, 1970, that date was the operative date for determining what law was to be applied.

Plaintiff originally argued that the authorization of "construction funding" in *San Antonio* was the crucial event and that, as construction funding has not been authorized in the instant case, *San Antonio* is ample authority for application of the NEPA. In this regard, plaintiff noted that the completion of various steps of the highway project in *San Antonio* (e. g., acquisition of part of the right-of-way, Bureau of Public Roads approval of the 1963 public hearing) prior to January 1, 1970 did not preclude the Court's application of the NEPA. Defendant Volpe counters this argument with the fact that all the pre-January 1, 1970, work in that case had been accomplished exclusively with state funds and that the August 23, 1970, federal approval and fund authorization was the first commitment of federal funds. Defendant Volpe notes that federal funds in the I–485 project here have been used from the beginning (1966) and argues that *San Antonio* is patently distinguishable from the instant case. In its reply brief, plaintiff appears to recognize this distinction but cites various other cases in which NEPA was applied to ongoing projects.[38]

35. D.C.Cir., 449 F.2d at 1128.

36. *Id.* at n. 43.

37. *Supra* note 1.

38. The highway project in *San Antonio* was extremely controversial and had been bitterly opposed since it was suggested in 1956. Although, as defendant Volpe

Having in mind the various approaches to the applicability issue in the different factual situations presented above, the Court must now determine the extent to which NEPA is applicable to the facts in the instant case. It is fairly clear that the location of the highway was fixed by the State Highway Department and approved by the FHWA as early as 1966. In this regard, it is not unreasonable to suggest, as does defendant Volpe, that the "authorization of funds [for construction] is a formalization of the federal government's commitment rather than an agency decision of substantive nature, as would be approval of the location and design."[39] Indeed, the Court deems this location or design "approval event" to be clearly the most appropriate time for consideration of these values.[40] The wisdom of designating one approval date as the "major federal action" date for purposes of NEPA applicability is made evident by the facts and decision in the San Antonio case. For that reason, for purposes of this ongoing project, the Court declines to concur with plaintiff's emphasis of the subsequent federal action of authorizing construction funding as a further critical "approval event" and as the determinative element in this case for to do so, the Court believes, would, at least tacitly, give the Court's imprimatur to the "piecemeal approval" approach declared unlawful in San Antonio.

■ This determination does not, however, end the inquiry. A recognition of the teachings of San Antonio and the Court's concurrence in the observation that the substantive federal approvals (of highway location and highway design) occurred prior to the effective date of the NEPA do not afford the defendants the opportunity to ignore the requirements of Section 102 of the NEPA. As did the Courts in Defense Fund and Calvert Cliffs, supra, this Court relies upon the clear legislative mandate that Section 102 of the NEPA be implemented "to the fullest extent possible." Also, the interim guidelines of the Council on Environmental Quality,[41] which strongly suggest the application of the Section 102 procedures to ongoing projects, are entitled to considerable weight.[42] While much work has already been done, the Court is not dealing with a fait accompli. In short, the Court holds that compliance with Section 102 of the NEPA is required as to an ongoing federal project on which substantial actions are yet to be taken, regardless of the date of "critical" federal approval of the project. The Court must

points out, the pre-1970 work had been accomplished exclusively with non-federal funds, it is clear that the project was envisioned as a federal-aid project from the beginning and the responsible officials ultimately anticipated federal funding. Though not directly by way of the federal purse, the Secretary of Transportation did play an important part in the controversy prior to 1970 and announced "conditional approval" of the project in 1968, pending the submission of design changes. In an effort to defuse the controversy, the Secretary divided the project into segments and approved construction of the two "end segments", leaving the middle segment, which went through the park, until later. In opposition to the plaintiffs' contention that 49 U.S.C. § 1653(f) was being violated, the Secretary argued that approval of the two end segments did not (technically) involve the taking of any park land. Noting that construction of the two end segments to

the very border of the park (from both sides) would drastically reduce, if not completely eliminate, the number of "feasible and prudent" alternatives to avoiding the park, the Court rejected the Secretary's "piecemeal approval", and specifically declared that approach "unlawful".

39. Defendant Volpe's Reply Brief at 6.

40. See text surrounding note 34, supra.

41. See text surrounding note 32, supra.

42. Insofar as "guidelines" are concerned, the Court notes that, although the effective date of the NEPA was January 1, 1970, and the interim guidelines of the Council on Environmental Quality were issued on April 30, 1970, there appears to have been no procedure for implementation of the NEPA set up by the Department of Transportation until late November 1970. (See Draft Instructional Memorandum dated November 24, 1970.)

remand this case to the Secretary of Transportation for compliance with Section 102 of the NEPA.[43]

■ This action should *not* be deemed to be ruling on the merits of the case; *i. e.*, a ruling on the question of whether or not the project should continue, be altered or be abandoned. That decision is, in the first instance, for the Secretary of Transportation upon his completion of the Section 102 procedures. Following the Secretary's determination, the Court will review whatever decision the Secretary makes under the appropriate standards of the Administrative Procedure Act.

■ Neither should the Court's decision be taken to suggest that previous expenditure of funds and the status of the work in general should be ignored. Obviously, defendants may approach the required compliance with Section 102 differently from what might be done with respect to new projects. For purposes of ongoing projects, in some instances, all that may be required for compliance would be appropriate updating. Any reasonable approach will be acceptable so long as the "detailed statement" requirement and other requirements of Section 102 are met.[44]

■■ While there is considerable support in the legislative history and in prior or case law for the proposition that NEPA should be applied retroactively,[45] the Court does not consider its ruling here as "retroactive" in the true sense of the word. The Court is not directing the defendants to rip up a multi-million dollar highway project or otherwise to undo anything that has already been done. All that is required, in this order, is compliance with the procedures in Section 102 before the project is continued. Should the Secretary's final decision require substantive alterations in or complete abandonment of the project, neither of which the Court means to suggest, then policy and constitutional considerations which normally accompany a proposed divestment of vested rights (contract or otherwise) must be taken into account.[46] The Court hastens to add, however, that the existence of executed contracts and the performance of prior contracts do not grant the project immunity from a requirement of thorough[47] compliance with Section 102 of the NEPA. Those who do business with

43. In remanding the case, the Court recognizes that the Court in *San Antonio* deemed the Secretary's approval of that project for federal funding the "critical" date for determining the applicability of the NEPA, which determination reflects at least tacit approval of the approach to the applicability issue employed by the courts in *Investment Syndicates, Brooks,* and *Bartlett,* all *supra.* The "critical" event in *San Antonio,* however, clearly occurred after the effective date of the NEPA and it was, therefore, unnecessary for the Court to rely upon or even consider the statutory language and legislative history relied upon here. The Court does not consider the decision in *San Antonio* as precluding, explicitly or implicitly, the Court's approach to the applicability issue in this case.

44. See Environmental Defense Fund v. Corps of Engineers, *supra,* note 13, 325 F.Supp. at 758.

45. Note, Retroactive Application of the NEPA, 69 Mich.L.Rev. 732 (1971); Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970). In *Zabel,* the Fifth Circuit applied the NEPA to a licensing decision of the Army Corps of Engineers which was made prior to the effective date of the Act. The Court merely stated that "the correctness of that decision [on the license application] must be determined by the applicable standards of today." *Id.* at 213. This brief statement does not shed much light on the retroactivity issue but the decision has been read as having "merely assumed the retroactive application of the Act without any further elaboration." Note, *id.* at 739.

46. A good analysis of the various policy and constitutional considerations which would attend a pure retroactive application of the NEPA is found in Note, Retroactive Application of the NEPA, *id.*

47. The detail required in Section 102 statements may be seen from the decision in Environmental Defense Fund v. Corps of Engineers, *supra* note 13. The statute requires a "detailed" statement and the Court expects nothing less than a thorough compliance with the statute.

a regulated federal agency, directly or indirectly, cannot necessarily object to what the agency is required to do or not do by virtue of subsequent statutory regulation.[48]

In addition to its contentions with regard to the NEPA, plaintiff alleges that defendants have violated various other federal statutes. While it is clear that the doctrines of *res judicata* and collateral estoppel cannot be invoked by the state or federal defendants, respectively, with regard to the NEPA issue,[49] the application of one or both of those doctrines to the other issues raised is not clear. Under traditional tests, it may be that the doctrine of *res judicata* would bar the raising of the other issues against the state defendant while the doctrine of collateral estoppel would *not* bar the raising of those issues against the federal defendant. An important factor in this regard is that the Court's application of the NEPA applies to both defendants, and precludes *both* the state and federal defendants from continuing with the project until the environmental studies have been accomplished. This approach is taken in light of the fact that the state and federal defendants have engaged in this venture from its inception, and, since the project has been a federal project from the beginning, the state, as a partner in the project, is bound by federal laws and regulations.[50] To separate the two defendants with respect to the effect of *res judicata* and/or collateral estoppel on issues other than NEPA would appear to be inconsistent with this approach.

In view of the above, all parties are directed to inform the Court, by brief or otherwise, of their respective positions on the effect, if any, of the doctrines of *res judicata* and/or collateral estoppel on the issues (other than NEPA) raised by the plaintiff, said brief to be prepared jointly by the state and federal defendants. Since the NEPA is a relatively comprehensive environmental statute, it may be that, as a practical matter, the considerations and procedures required by Section 102 of the NEPA will overlap with the requirements of other statutes and that compliance with Section 102 will be tantamount to compliance with other statutes.

Defendant Volpe has indicated that compliance with Section 102 of the NEPA will take a substantial amount of time. Thus, whatever remand proceedings, if any, are required with regard to the other issues raised presumably can be accomplished within the time required for NEPA compliance. The parties are allowed thirty (30) days from the filing of this order to submit the required briefs on the other issues raised in the complaint.

The Court does not wish to suggest by this ruling that defendants have in any way acted in other than the utmost good faith in performing their statutory functions. In fact, the sheer weight of the administrative record, which consists of over 350 exhibits, reveals clearly the substantial amount of time and effort which has been spent on all aspects of the project and in the attempt to comply fully with all legal requirements.

Defendants Volpe and Lance are hereby enjoined, pending final decision of the Court, from proceeding with any action in furtherance of the development or construction of the federal-aid project, Interstate 485, except to the extent necessary to comply with the procedures set out in Section 102 of the NEPA; provided that defendants will not be precluded, upon application to (and approval of) the Court with notice to the plaintiff, from taking actions which are required by compelling practical or emergency considerations.

48. *Cf.* Federal Housing Administration v. The Darlington, Inc., 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958).

49. See text surrounding notes 7–11, *supra*.

50. See Named Individual Members of San Antonio Conservation Society v. Texas Highway Department et al.. *supra* note 1.