**George and Mary DALY et al., Plaintiffs,**

**v.**

**John A. VOLPE, as Secretary of Transportation, et al., Defendants.**

**Civ. A. No. 9490.**

United States District Court, W. D. Washington, at Seattle.

March 31, 1972.

On Rehearing Aug. 4, 1972.

See also, D.C., 326 F.Supp. 868.

Irving M. Clark, Jr., J. Richard Aramburu, Seattle, Wash., for plaintiffs.

Stan Pitkin, U. S. Atty., Albert E. Stephan, First Asst. U. S. Atty., Seattle, Wash., for Federal Defendants.

Thomas R. Garlington, Asst. Atty. Gen., Olympia, Wash., for State Defendants.

OPINION

BEEKS, Chief Judge.

Plaintiffs, individual residents and property owners in or near the proposed corridor of I–90, a federally funded interstate highway through the State of Washington, seek to enjoin its construction. They base their claim on essentially two grounds: First, that selection of the location of this corridor was arbitrary and capricious, and second, that defendants violated the provisions of certain federal statutes.[1]

The facts of this case are not essentially in dispute. The state proposes to construct a section of I–90 in the vicinity of North Bend, Washington. The first corridor location hearing was held on April 8, 1957. The issues lay dormant until July 30, 1969, when the location design engineer sent letters to interested parties, requesting comment on corridor A–3, a segment of the proposed highway that would parallel the location of the existing highway, U.S. 10, and also pass through the town of North Bend. A second location hearing was held on December 3, 1969. Meetings with interested groups were held through the summer of 1970. Late in August, 1970, the state made public an "Environmental Report of the Upper Snoqualmie Valley," which did not discuss alternative routes, but did provide a summary of information which bore on choosing a route most favorable to the environment. This "Environmental Report" was distributed at the third corridor location hearing of September 1, 1970. Following this last hearing, the state and federal defendants for the first time advocated construction through corridor E–3, which would completely bypass North Bend to the south.

The "Environmental Report" and an "Advance Planning Study" were transmitted to the Federal Highway Administration (FHWA) division engineer on September 25, 1970. The state's request for approval of corridor E–3 was sub-

---

1. 42 U.S.C.A. § 4321 et seq. (1972 Supp.); 23 U.S.C.A. § 138 (1972 Supp.).

mitted November 4, 1970, and its draft environmental impact study was sent to FHWA on November 25, 1970. Corridor E–3 was approved November 30. A second draft environmental statement of January 13, 1971, and a "Final Environmental Statement" of February 8, 1971, were subsequently sent to FHWA. Neither of these environmental reports considered the ecological effects of the highway on Kimball Creek Marsh, a non-publicly owned refuge for waterfowl close to which the proposed highway will pass.

## ARBITRARY AND CAPRICIOUS ACTION

Plaintiffs charge that the state arbitrarily changed the corridor location because of extraneous political pressure on FHWA officials brought by the mayor and/or town council of North Bend.[2] This contention is rejected. I am satisfied that new evidence and studies led the federal administrators to reevaluate their decision and change the corridor location to one which they believe is better suited to the area.

Plaintiffs further urge that arbitrary and capricious conduct is established by compelling evidence that corridor A–3 is superior to E–3. They claim, among other things, that A–3 would cover more land occupied by existing highways, that E–3 will destroy the last and best residential land in the valley, that the state will be forced to sell the property it has already purchased for A–3 at a loss, and that a change in routes would disrupt the private plans of many individuals who have since 1957 governed their affairs on the assumption that A–3 would be the route. Defendants, on the other hand, argue that A–3 would cut through Si

View County Park, that less property would be taken from the tax rolls by E–3, that A–3 would create a barrier for natural growth of the town, and that E–3 passes through a relatively undeveloped area of land.

The court may not, however, weigh the evidence *de novo,* to decide which of several alternatives is to the court most desirable. Only if the administrative decision is so clearly erroneous that it has no rationally supportable basis may the court rule that it is arbitrary and capricious.[3] The complexity of variables to be considered by defendants in the location of a major highway route such as this illustrate well the reasons for the rule. Both proposed routes have advantages and disadvantages. Defendants studied both proposals in depth, and came to a decision that is eminently reasonable. The decision approving E–3 was made after a consideration of the relevant factors; it was not clearly erroneous, and therefore it was not arbitrary and capricious.[4]

Even so, defendants must follow the procedural requirements outlined by the applicable federal statutes and regulations with respect to highway location.

## ENVIRONMENTAL PROTECTION

*1. Kimball Creek Marsh*

23 U.S.C.A. § 138 (1972 Supp.) provides:

§ *138. Preservation of parklands*

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.

2. *See, e. g.,* D.C. Federation v. Volpe, 148 U.S.App.D.C. 207, 459 F.2d 1231 (1971).

3. *See, e. g.,* Willapoint Oysters, Inc. v. Ewing et al., 174 F.2d 676 (9th Cir. 1949), cert. den. 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527, reh. den. 339 U.S. 945, 70 S.Ct. 793, 94 L.Ed. 1360; United Steelworkers of America AFL–CIO v. N.L.R.B., 126 U.S.App.D.C. 215, 376 F.2d 770 (1967), cert. den. Northwest

Engineering Co. v. N.L.R.B., 389 U.S. 932, 88 S.Ct. 297, 19 L.Ed.2d 285; and Carlisle Paper Box Co. v. N.L.R.B., 398 F.2d 1 (3d Cir. 1968).

4. Citizens to Preserve Overton Park et al. v. Volpe et al., 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Road Review League, Town of Bedford et al. v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967).

The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

■ Plaintiffs contend that, because Kimball Creek Marsh is a wildlife and/or waterfowl refuge, federal defendants erred in failing to make the required findings with respect thereto. This contention is rejected; the marsh is not publicly owned.

*2. National Environmental Policy Act (NEPA)*

Plaintiffs next contend that defendants failed to follow the required procedures with respect to drafting and filing an environmental impact statement. NEPA, which became law on January 1, 1970, requires that "all agencies of the Federal Government shall—[5]

. . . . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes; . . .

Such "detailed statement" should "be prepared at the earliest practicable point in time" so that the statement can provide "significant inputs to the decision-making process." [6]

Given the purpose of NEPA to insure that actions by federal agencies be taken with due consideration of environmental effects and with a minimum of such adverse effects, it is especially important with regard to federal-aid highway projects that the

---

5. 42 U.S.C.A. § 4332(2)(C) (1972 Supp.).

6. DoT Order 5610.1 (October 7, 1970) § 7(d).

[environmental impact] statement be prepared early.[7]

NEPA requires compliance "to the fullest extent possible." [8] Such compliance would seem to demand that environmental issues be considered at every important stage in the decision making process concerning a particular action—at every stage where an overall balancing of environmental and non-environmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs.[9]

The environmental impact statement helps to ensure

that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own.[10]

The impact statement must be in the form and detail required by NEPA, and then circulated among the agencies described in the statute for comment.[11]

■ The state has argued that it is not subject to the provisions of NEPA. This position is rejected in Lathan v. Volpe [12] and Brooks v. Volpe.[13] It should be noted that the Court of Appeals assumed jurisdiction in both of these cases without specifically discussing the jurisdictional issue. These cases must, however, stand for the implied holding that federal courts have jurisdiction over officials of states which receive federal grants-in-aid if federal environmental protection statutes are violated, and I so hold.[14]

■ In the early stages of this case, the court was much concerned about the enormous additional public expense which would result from enjoining construction until strict compliance with the provisions of NEPA and its implementing regulations had been achieved, and I denied a preliminary injunction because I believed that there had been a substantial compliance therewith. I am now satisfied, however, that the law as it has since evolved mandates strict compliance with NEPA and that the position heretofore taken by me has been rejected. The provisions of NEPA are not highly flexible, but establish a strict

---

7. Lathan et al. v. Volpe et al., 455 F.2d 1111 (9th Cir. November 15, 1971), reh. 455 F.2d 1122 (February 8, 1972).

8. 42 U.S.C.A. § 4332 (1972 Supp.). See Calvert Cliffs' Coordinating Committee, Inc. et al. v. United States Atomic Energy Commission et al., 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

9. Calvert Cliffs', supra note 8, 449 F.2d at 1118.

10. Id. at 1114; Committee for Nuclear Responsibility v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971). Cf. Scenic Hudson Preservation Conf. v. F.P.C., 453 F.2d 463 (2d Cir. 1971).

11. 42 U.S.C.A. § 4332(2)(C) (1972 Supp.). See Natural Resources Defense Council et al. v. Morton et al., 337 F. Supp. 170 (D.C.D.C.1972).

12. Lathan et al. v. Volpe et al., 455 F.2d 1111 (9th Cir. November 15, 1971), reh. 455 F.2d 1122 (February 8, 1972).

13. Brooks et al. v. Volpe et al., 460 F.2d 1193 (9th Cir. 1972).

14. See Named Individual Members of the San Antonio Conservation Society et al. v. Texas Highway Dept. et al., 446 F.2d 1013, 1028 (5th Cir. 1971), reh. and reh. en banc den. 446 F.2d at 1029, stay and cert. granted, 400 U.S. 939, 91 S.Ct. 231, 27 L.Ed.2d 262, stay vac., 400 U.S. 961, 91 S.Ct. 361, 27 L.Ed.2d 381, cert. den. 400 U.S. 967, 91 S.Ct. 363, 27 L.Ed.2d 388, reh. den. 401 U.S. 926, 91 S.Ct. 884, 27 L.Ed.2d 830; Morningside-Lenox Park Assn. v. Volpe et al., 334 F. Supp. 132 (N.D.Ga.1971); Nolop v. Volpe et al., 333 F.Supp. 1364 (D.So. Dak.1971); LaRaza Unida v. Volpe et al., 337 F.Supp. 221 (N.D.Cal.1971). Cf. Willamette Hts. Neighborhood Assn. v. Volpe et al., 334 F.Supp. 990 (D.Or. 1971).

But see Ely et al. v. Velde et al., 451 F.2d 1130 (4th Cir. 1971); and Greene County Planning Board v. F.P.C. et al., 455 F.2d 42 (2d Cir. 1972). Cf. Miltenberger et al. v. Chesapeake & Ohio Ry. Co. et al., 450 F.2d 971 at 974 (4th Cir. 1971).

standard of procedure.[15]  I am most sympathetic to the state's position, and I regret that compliance with NEPA at this late date will delay construction.

But some delay is inherent whenever the NEPA consideration is conducted . . . . It is far more consistent with the purposes of the Act to delay operation at a stage where real environmental protection may come about than at a stage where corrective action may be so costly as to be impossible.[16]

It is true that the details of the state's environmental impact statement now required by regulation were not clearly outlined until after the state had drafted its statement.[17]  However, the three documents which the state filed with FHWA prior to location approval did not meet the statutory and regulatory requirements existing at the time of the state's request.[18]  Said documents are the state's "Environmental Report," "Advance Planning Study," and an "Environmental Statement."

*a.  The "Environmental Report" and "Advance Planning Study"*

█ Neither the "Environmental Report" nor the "Advance Planning Study" complies with NEPA, although the state should be commended for the polished and professional quality of both reports. The court's objection is not that they were poorly done, but that they fail to ask and answer all of the pertinent questions.[19]  The two reports, singly and in combination, fail to adequately analyze the five subjects identified by NEPA. The discussion of the environmental impact of the proposed location is not acceptable; it inadequately discusses the effects of corridor E–3 on the surrounding environment, particularly on Kimball Creek Marsh. Adverse environmental effects should be listed and discussed in a single section of the statement, and not scattered throughout the report. The court believes that the alternatives to the proposed corridor are adequately discussed in the "Advance Planning Study," which may be incorporated by reference in the new environmental impact study. Neither report sufficiently discusses the relationship between local short-term uses of man's environment and long-term productivity. Finally, there is virtually no discussion of irreversible and irretrievable commitments of resources involved in locating the highway in corridor E–3.

*b.  The First Draft Environmental Impact Statement*

█ The state's first draft environmental impact statement was drafted in the form required by statute, but was ambiguous and self-contradictory. Paragraph one, concerning the environmental impact of the highway, failed to discuss Kimball Creek Marsh, and was too general and ambiguous. In redrafting an impact statement, state defendants may use information from the "Environmental Report", as pertinent, but must specifically discuss the effects of corridor E–3 on the area which that report concerned.

The second paragraph was inadequate. All adverse environmental effects should be listed, and harmful effects which cannot be avoided must be discussed to indicate what measures can be taken to minimize the harm. The state's draft environmental impact statement was far too

15.  *See, e. g., Calvert Cliffs', supra* note 8; Environmental Defense Fund, Inc. et al. v. Corps of Army Engineers et al., 325 F.Supp. 728 (E.D.Ark., 1971) ; and Ely et al. v. Velde et al., 451 F.2d 1130 (4th Cir. 1971).

16.  *Calvert Cliffs', supra* note 8, 449 F.2d at 1128.

17.  C.E.Q. Guidelines, 36 F.R. 7724 (April 23, 1971) ; and DoT Policy and Procedure Memorandum 90–1, § 6(c) (August 24, 1971), reproduced in v. 1, "102 Monitor," October 1971, pp. 7–30.

18.  Executive Order # 11514, 3 C.F.R. ch. II at 104 (March 5, 1970) ; C.E.Q. Interim Guidelines, 35 F.R. 7390 (April 30, 1970) ; and DoT Order 5610.1 (October 7, 1970).

19.  *See, e. g.,* Natural Resources Defense Council et al. v. Morton et al., 148 U.S. App.D.C. 5, 458 F.2d 827 (1972).

general and not sufficiently detailed. This paragraph may include relevant information found in the "Advance Planning Study," e. g., on page 3.

Alternative routes were sufficiently discussed in the state's "Advance Planning Study," which may, as previously mentioned, be incorporated by reference into paragraph three of the new environmental impact statement.

Paragraph four of the draft impact statement is too general and not sufficiently detailed. The subjects discussed are relevant to the requirements of NEPA, but are conclusory rather than analytical. Relevant portions of the "Advance Planning Study" (e. g., pp. 3 and 25–33) and of the "Environmental Report" (e. g., pp. 14–19) may be reproduced in paragraph four of the new statement.

The fifth paragraph of the draft impact statement is totally unsatisfactory.[20] It should list, among other things, (1) the cost of land, construction materials, labor, and other economically measurable costs which cannot be retrieved once a highway is constructed; and (2) the resources which may be irretrievably lost, and the nature of each such loss, to which a dollar value cannot be readily assigned—for example, the loss of forested recreational land.

■ Aside from these deficiencies, the state's first draft environmental impact statement was inadequately considered by FHWA. Indeed, the decision approving route E–3 came the first business day following receipt of the statement.[21] The statute contemplates more deliberation than the time required to use a rubber stamp.[22]

*c. Subsequent Draft Environmental Impact Statements*

■ Subsequent drafts of January 13, 1971 and February 8, 1971, obviously did not correct the situation, since the final agency decision as to location of the highway had already been made. The environmental impact statement was intended by Congress to provide decision-making bodies with sufficient information to make an environmentally sound decision, not to offer evidence of the wisdom of that decision once it has been made.[23]

## CONCLUSION

■ It is the judgment of the court that defendants have failed to conform to the procedural requirements of 42 U.S.C. § 4332(2)(C). The state must prepare a draft environmental impact statement which conforms to those requirements, circulate it among interested agencies, and make it available to the public prior to another public location hearing.[24] The state shall then prepare

20. Exhibit A–11, subparagraph (v):
As a practical matter the land area occupied by this highway will probably be continually devoted to this use, however, that portion of the right of way not specifically dedicated for highway purposes could be perpetuated as a green belt or open space. If practicality was not an issue and a decision was made to reconstitute the original condition, it would appear any thing done in implementing the proposal could be undone.
This is the entire text of the subparagraph.

21. November 27, 1970, was a Friday, the day after Thanksgiving; and November 30 was a Monday, the day of location approval.

22. *Cf. Lathan, supra* note 12, 455 F.2d at p. 1121:
Given the purpose of NEPA to insure that actions by federal agencies be taken with due consideration of environmental effects and with a minimum of such adverse effects, it is especially important with regard to federal-aid highway projects that the § 102(2)(C) statement be prepared early.

23. *See, e. g., Calvert Cliffs', supra* note 8.

24. P.P.M. 90–1, subparagraphs 6a–6g. The court notes that subparagraph 6c provides:
. . . An additional location or design public hearing will not be required for the sole purpose of presenting and receiving comments on the draft environmental statement for those proj-

a final environmental impact statement, append to it a compilation of the comments received, and submit these, together with a new application for approval of the state's suggested location of I–90, to the Regional Federal Highway Administrator.[25] Federal defendants shall then process the application according to existing regulations.[26] Both the state and federal defendants shall carefully consider the ecological effects of the highway upon Kimball Creek Marsh.

· This opinion shall serve as the court's findings of fact and conclusions of law pursuant to Civ.R. 52(a); the order of the court has heretofore been entered.

## OPINION ON REHEARING

The court's opinion of March 31, 1972, identified two types of deficiencies under the National Environmental Policy Act of 1969 (NEPA)[1]—procedural defects in the preparation and circulation of the impact statement, and lack of detail therein. The "Environmental Report" and "Advance Planning Study" which were introduced as evidence at the trial were not organized in the manner outlined by NEPA. While this defect was not in itself fatal to defendants' position, it did force the court to piece together a completed impact statement from a number of sources, as if putting together a jigsaw puzzle, instead of merely reviewing a properly designed impact statement, which is the proper function of the court.[2] In preparation for the rehearing on June 15, 1972, defendants conducted what has been appropriately characterized as a "cut and paste job," by which they mercifully rearranged the evidence which the court has again reviewed. I am still satisfied that my original opinion is correct, and that the defendants did not prepare the "detailed" statement required by law.

Most of the procedural defects relate to inadequate advance notice to the public of defendants' intention to favor route E–3, and the lack of opportunity by the public to meaningfully comment on the impact statement. While the public hearing is not to be equated with a quasi-judicial or quasi-legislative proceeding,[3] there can be no doubt that such public comment is an essential part of the input for the decision-making process in federal-aid highway projects.[4] The impact statement is ordinarily made available to the public for some time prior to the hearing.[5] In this case, there was insufficient notice to give the public enough time to consider the environmental impact of the proposal.

▆ Because of the urgency of the situation in this case, and because the

ects which were processed in accordance with procedures in effect at the time.

Since the court believes that statutory and regulatory procedures existing at the time the state submitted its request for location approval were not properly followed, the exception quoted is inapplicable to this case.

25. P.P.M. 90–1, subparagraph 6i.

26. P.P.M. 90–1, subparagraphs 6j–1.

Greene County Planning Board v. F.P.C. et al., 455 F.2d 412 (2d Cir. 1972), holds that the federal obligation to prepare an environmental impact statement may not be delegated to a state agency. Cf. Ely et al. v. Velde et al., 451 F.2d 1130 at 1139 (4th Cir. 1971); and Miltenberger et al. v. Chesapeake & Ohio Ry. Co. et al., 450 F.2d 971 at 974 (4th Cir. 1971). This question has not been presented in this case.

1. 42 U.S.C.A. § 4321 et seq. (1972 Supp.).

2. Harrisburg Coalition Against Ruining the Environment et al. v. Volpe et al., 330 F.Supp. 918 at 928, 932 (M.D.Pa.1971).

3. Citizens to Preserve Overton Park et al. v. Volpe et al., 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

4. See, e. g., Executive Order No. 11514 § 2(b) (March 5, 1970), 35 F.R. 4247; Council on Environmental Quality (CEQ) Interim Guidelines § 10(a) and (b) (April 30, 1970), 35 F.R. 7390; CEQ Guidelines § 10(e) (April 23, 1971), 36 F.R. 7720; Department of Transportation Order 5610.1 § 7(d) (October 7, 1970); and Federal Highway Administration Policy and Procedure Memorandum (PPM) 90–1, par. 6(c) (August 24, 1971).

5. PPM 90–1, par. 6 (August 24, 1971).

alternative routes (including E–3) were clearly outlined at the September 1, 1970 hearing, defendants will not be required to conduct a new location hearing. They must, however, follow a procedure which is reasonably tailored to allow effective public comment to aid in the correction of the deficiencies in the impact statement outlined in the opinion heretofore filed in this case.[6]

Arlington Coalition on Transportation et al. v. Volpe et al., 458 F.2d 1323 (4th Cir. 1972), is distinguishable. The hearings in that case were held in 1958, and environmental effects were not considered. Here, the hearing was much more recent, and there can be no dispute that the impact of the highway on the environment was considered. In Ward v. Ackroyd et al., 344 F.Supp. 1202 (D. Md.1972), a major route alternative was not even identified at the hearing. Here, the alternatives were clearly identified at the hearing. Willamette Hts. Neighborhood Ass'n et al. v. Volpe et al., 334 F.Supp. 990 (D.Or.1971), is also distinguishable. There, a substantial addition to the original plans was made without a new hearing at all, and the state conceded that the applicable regulation had not been followed.

In order to prevent the delay necessarily involved in defendants' preparing and submitting a schedule for compliance, the court is directing the following course of action, which is drawn from the requirements set forth in PPM 20–1 and PPM 90–1:

State and federal defendants shall circulate a draft impact statement for comment from the appropriate agencies, as provided by PPM 90–1, par. 6c and d. In order to expedite final disposition of this matter, defendants may use the impact statement filed herein as the draft impact statement. Moreover, in lieu of a public hearing, state defendants shall publish a public notice in a newspaper having general circulation in the vicinity of the segment of the highway under question. The notice shall concisely describe the proposal, briefly summarize the alternatives considered, and include such other general information regarding the environmental impact of the project as the state deems desirable. A map depicting the project as proposed and the alternative routes shall be included in the notice. The public notice shall specify that the draft impact statement and other pertinent information will be available for public inspection and copying for sixty days following the date of publication of the notice, and shall specify reasonable locations and times where these materials will be made available for public inspection and copying. The locations described in PPM 90–1, par. 6g are reasonable. The notice shall state that written comments will be considered by project administrators, and it shall briefly describe the procedure for submitting such comments. Comments received sixty days after publication of such notice need not be considered by defendants. Any additional research deemed necessary by defendants to prepare a detailed impact statement shall be conducted. In light of such research, and in light of comments received from government agencies and the public, state defendants shall prepare and submit for federal approval a final impact statement. All comments received shall be appended to the final impact statement, *provided* that comments received from the general public may be summarized in groups by subject matter. Federal defendants shall process the final impact statement in accordance with PPM 90–1, par. 6j–1.

In complying with the court's order, I think it appropriate to state that in the opinion heretofore filed the court's remarks with respect to Kimball Creek Marsh have been given greater weight by one or more of the parties than was intended. The impact of the highway on Kimball Creek Marsh should be given no more and no less emphasis by defendants than its impact on any other area in proximity to the highway.

6. *Cf.* E.D.F. et al. v. Corps of Army Engineers et al., 325 F.Supp. 749 at 757 (E.D.Ark.1971).